AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Hangar B-3, Portales Municipal Airport, 181 Airport Rd
Portales, NM 88130

)
)
)
)
)
)

Case No. **23 MR 616**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. §§ 1343, 1344, 1349, 1956, and 1957 | Wire Fraud, Bank Fraud, Conspiracy, Money Laundering, Engaging in a Monetary Transaction in Criminally Derived Property |

The application is based on these facts:

See attached affidavit, submitted by FBI Special Agent Robert Balint and approved by AUSA Taylor Hartstein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Robert Balint, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by being
_telephonically sworn and electronically signed_ *(specify reliable electronic means).*

Date: March 20, 2023

*Judge's signature*

City and state: Albuquerque, NM

Honorable John F. Robbenhaar, US Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>**Hangar B-3, Portales Municipal Airport,**<br>**181 Airport Rd Portales, NM 88130** | Case No. _____ |

### AFFIDAVIT IN SUPPORT OF

### AN APPLICATION FOR A SEARCH WARRANT

I, Robert Thomas Balint, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under

Federal Rule of Criminal Procedure 41.  Based on the facts set forth in this affidavit, I believe the

property to be searched, more fully described in Attachment A, is currently being used to store

an aircraft, more fully described in Attachment B, which is subject to civil and criminal

forfeiture as proceeds (i.e., fruits) of wire fraud, bank fraud, and conspiracy in violation of Title

18 United States Code §§ 1343, 1344, and 1349, as well as property involved in money

laundering in violation of Title 18 United States Code §§ 1956 and 1957 (as described in a

separate application for a seizure warrant submitted simultaneously with this application).  There

is probable cause to believe the search of the property identified in attachment A will lead to

evidence, fruits, and/or instrumentalities of violations of Title 18 United States Code §§ 1343,

1344, 1349, 1956 and 1957.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

been employed in this capacity since December 2020.  I am currently assigned to the

Albuquerque Division, White Collar Crime Squad, and my primary investigative responsibilities

include investigating complex financial crimes.  Throughout my career as a Special Agent with the FBI, I have conducted investigations involving financial crimes to include cases involving wire fraud and theft from the United States Government.

3.      The information set forth in this Affidavit was derived from my own investigation and/or communicated to me by other law enforcement professionals, and from records and documents that I, and others, have reviewed.  I have not included every fact known to me concerning the investigation.  I have set forth only the facts that I believe are necessary to demonstrate probable cause to search the property described in Attachment A for the property described in Attachment B.

4.      As indicated above, this search warrant is being pursued in conjunction with an application for a seizure warrant for the property described in Attachment B, among other property.

5.      I assert that, based upon the facts detailed in this Affidavit, probable cause exists to believe an aircraft further described in this Affidavit, and Attachment B, constitutes evidence of, proceeds (i.e., fruits) of, and property designed for use, intended for use, or used in, violations of Title 18 U.S.C. §1343 (Wire Fraud), Title 18 U.S.C. §1344 (Bank Fraud), Title 18 U.S.C. §1349 (Conspiracy), Title 18 U.S.C. § 1956 (Laundering of Monetary Instruments), and Title 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity).  *See* Fed. R. Crim. P. 41(c)(1)-(3).  I further submit that there is probable cause based on the facts detailed in this Affidavit to believe that the aircraft is currently located in the hangar constituting the "property to be searched" as set out in Exhibit A.

## RELEVANT CRIMINAL STATUTES

6.      Title 18 U.S.C. § 1343 provides the following:

2

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication, in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years or both.  If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency . . . or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

7.      Title 18 U.S.C. § 1344 provides the following:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

8.      Title 18 U.S.C. § 1349 provides the following:

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

9.      Title 18 U.S.C. § 1956(a)(1) provides the following:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (B) knowing that the transaction is designed in whole or in part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

10.     Title 18 U.S.C. § 1956(h) states that "[a]ny person who conspires to commit any

offense defined in this section or section 1957 shall be subject to the same penalties as those

prescribed for the offense the commission of which was the object of the conspiracy."

11.     Title 18 U.S.C. § 1956(c)(9) defines "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."

12.     Title 18 U.S.C. § 1957(a) provides that "[w]hoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)."  Subsection (d) provides, in relevant part, that "[t]he circumstances referred to in subsection (a) are—(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States."

## **PROBABLE CAUSE**

13.     As described in the application and affidavit for a seizure warrant submitted concurrently with this application,[1] FBI has identified a 1964 PIPER PA-24-250 aircraft, serial number 24-3660, tail number N8404P (the "Aircraft") that constitutes property that is subject to forfeiture.  As further indicated herein, the property also constitutes evidence of, proceeds (i.e., fruits) of, and property designed for use, intended for use, or used in, violations of Title 18 U.S.C. §1343 (Wire Fraud), Title 18 U.S.C. §1344 (Bank Fraud), Title 18 U.S.C. §1349 (Conspiracy), Title 18 U.S.C. § 1956 (Laundering of Monetary Instruments), and Title 18 U.S.C.

---

[1] That application and affidavit are incorporated by reference and attached hereto as Exhibit 3.

§1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity).  *See* Fed. R. Crim. P. 41(c)(1)-(3).

14.     Records reviewed by FBI personnel indicate that Leonard Vandenberg and Christy Vandenberg own the Aircraft and that Leonard Vandenberg has an active pilot's license.

15.     Financial records obtained from USAlliance, a credit union and lender, indicate that on or about July 5, 2019, Leonard Vandenberg applied for a loan to purchase the Aircraft. The collateral for this loan was the Aircraft itself.  Loan application documents indicate that the Aircraft would be flown by Leonard Vandenberg and hangared at KPRZ.  KPRZ is the airport call sign for Portales Municipal Airport, located in Portales, New Mexico.

16.     As explained more fully in the application and affidavit for the seizure warrant, attached as Exhibit 3, the remaining balance on the loan taken out by Leonard Vandenberg and collateralized by the Aircraft was paid off on or about May 17, 2022, using a transfer of $63,980.33 from a bank account belonging to a business owned by Leonard and Christy Vandenberg.  Prior to this transfer, but on or about the same day, this business bank account received approximately $800,000.00 from the Small Business Administration (SBA) in Economic Injury Disaster Loan (EIDL) proceeds under a program providing disaster relief for businesses negatively affected by the COVID-19 pandemic.

17.     As more fully explained in the application and affidavit included in Exhibit 3, there is probable cause to believe that the use of EIDL proceeds for non-business expenses (i.e., to pay off a loan associated with a personally owned aircraft) violated the conditions of the EIDL program and the representations made by Leonard Vandenberg and related businesses in EIDL loan documents.

18.     Based on the facts set out in this Affidavit, I submit that the Aircraft constitutes proceeds of wire fraud, bank fraud, and conspiracy, as well as property involved in money laundering or property traceable to money laundering.  Specifically, the $63,980.33 transaction to pay off the outstanding aircraft loan was funded substantially with EIDL proceeds derived from materially false statements and pretenses included in the loan application materials.  The EIDL application materials were submitted using interstate wires.  There is therefore probable cause to believe that the $63,980.33 transaction used to pay off the loan included proceeds of wire fraud in excess of $10,000 and therefore violated 18 U.S.C. § 1957(a).

19.     Records obtained from James Polk Stone Community Bank show monthly payments of $120.00 made via checks from a bank account controlled by Leonard and Christy Vandenberg (JP Stone bank account ending in 7426, held in the name of one of their businesses, Corclyn Enterprises) to Portales Municipal Airport.



20.     According to the Portales Municipal Airport website, "The Portales Municipal Airport can accommodate most general aviation aircraft.  The Portales Municipal Airport

consists of a terminal building, 20 T-Hangars, 2 runways, and a Jet-A fuel truck and both a Jet-A and 100- LL self-service tank."[2]

21.     According to a document titled "Portales Municipal Airport Rental/Lease Agreement" obtained by FBI from the City of Portales, Leonard Vandenberg entered into a lease agreement with the city of Portales Municipal Airport on or about September 20, 2019.  Exhibit 1 (Rental/Lease Agreement).  The document shows that Vandenberg agreed to lease hangar "B-3" for the purpose of storage of an aircraft, N "8404P, "make "PIPER," model "PA-24-250," year "1964."  Vandenberg agreed to pay a monthly sum of $120.00.

22.     According to a diagram obtained from the City of Portales, Leonard Vandenberg is listed as the lessee for hangar B-3.  Exhibit 2 (Diagrams and Images of Hangar).  Based on my review of all materials provided to FBI by the City of Portales, the diagram appears to be up to date as of February 2023.

23.     Based on my review of materials provided by Portales Municipal Airport and the Portales Municipal Airport website, the diagrams and images in Exhibit 2 appear to depict unit B-3 as a particular aircraft hangar located in a group of buildings containing various aircraft hangars.  The outlining and labeling of the buildings depicted in imagery of the hangars was performed by representatives of Portales Municipal Airport and appear to correspond to the buildings contained in the accompanying diagram, indicating that the hangar rented/leased by Leonard Vandenberg is located in the third hangar position in the "B" building (i.e., "B-3").

24.     Information received from the Federal Aviation Administration and other federal agencies indicates that the most recent flight performed by the aircraft traveled from Lubbock Executive Airport (F82-Lubbock) in Lubbock, Texas, to Portales Municipal Airport (KPRZ) on

---

[2] https://portalesnm.gov/services/departments_g-z/municipal_airport/index.php

December 26, 2021.  I therefore submit that there is probable cause to believe that the aircraft is still located at the Portales Municipal Airport.

## AUTHORIZATION REQUEST

25.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41, that authorizes members of the Federal Bureau of Investigation or their authorized representatives, including but not limited to other law enforcement agents, to search the property described in Attachment A, within the District of New Mexico, for the property described in Attachment B within 14 days of the issuance of the proposed warrant.

## REQUEST FOR SEALING

26.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application.  I believe that sealing these documents is necessary because the information included therein is relevant to an ongoing investigation into criminal activity that is not yet complete.  Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

27.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

28.     This Affidavit was reviewed and approved by AUSA Taylor Hartstein on March

20, 2023.

Respectfully submitted,

Robert T. Balint
Special Agent
Federal Bureau of Investigation

Electronically signed and telephonically sworn on March 20,
2023

HONORABLE JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

## **Attachment A**

The property to be searched is:

Hangar B-3, Portales Municipal Airport, 181 Airport Rd Portales, NM 88130.

## Attachment B

Property to be seized:

1.  1964 Piper PA-24-250 Aircraft serial number 24-3660, tail number
    N8404P.

2.  All accompanying apparatus to include keys, logbooks, and operating

    manuals/handbooks.

Exhibit 1

1

# Portales Municipal Airport Rental/Lease Agreement

This Agreement, hereby made and entered into this $\underline{20}$ day of $\underline{September}$ $\underline{2019}$, by and between the City of Portales, New Mexico, a municipal Airport, hereinafter called Lessor, and $\underline{Leonard\ Vandenberg}$ hereinafter called Lessee.

A. Lessor owns a public airport known as the Portales Municipal Airport, located five miles SW of Portales NM, hereinafter called Airport.

B. Lessee desires to lease certain assets described herein that are owned and maintained by lessor.

It is therefore agreed as follows;

Lessee agrees to lease from Lessor, and Lessor agrees to rent to Lessee, the property described as, $\underline{B-3}$ for the purpose of storage of the following aircraft;

N $\underline{8404P}$ Make $\underline{Piper}$ Model $\underline{PA-24-250}$ YR $\underline{1964}$

1. Lessee hereby agrees to pay Lessor the sum of $ $\underline{120^{00}}$ per month as rental, the first month rental to be paid in advance upon signing. Each rental payment thereafter is due on or before the 15th day of each succeeding month.

2. This agreement may be extended on a month to month basis if the account is current and if lessee is not in default and retains status as a current aircraft owner. Lessee shall notify Lessor at least 15 days in advance of their desire to terminate this lease. Sale of the aircraft may terminate this lease. Lessee shall notify Lessor immediately upon sale of aircraft and identify any replacement aircraft.

3. CONDITIONS OF PREMISES; Lessee accepts the lease property in its present condition and agrees that upon termination said lease will be in same condition. Lessee agrees and has inspected the same and all improvements located thereon, and that it is receiving the same in good condition and repair. Lessee agrees that upon termination it will deliver the premises to Lessor in as good repair and condition as when received, loss resulting from normal use and wearexcepted. Lessee shall not make any addition, or improvement to the premises without written consent of Lessor. Fixtures, equipment and additions installed may be removed by Lessee providing that no damage to the premises will result from such removal. Lessee agrees to bear all costs and expenses incident to the occupancy and maintenance of the structure and improvements placed therein, including snow clearance. Title to fixtures, improvement, equipment and other property not removed as of the expiration or termination of this agreement, shall vest with l Lessor.

4. DEFAULT; If Lessee fails to pay the rent in the time and manner prescribed, or violates or fails to preform within the covenants, terms or conditions of this agreement, then, at the option of the Lessor, this Lease shall be considered null and void. It is agreed that Lessor shall have a lien upon the property therein and may dispose of the same to satisfy any unpaid rent. Lessor shall be

2

entitled to immediate possession of the premises hereby leased, or may pursue any remedy of law or in equity and shall be entitled to recover a reasonable attorneys fee in enforcing this agreement of making demand upon Lessee. In addition, the City shall be entitled to recover its costs associated with the removal of any properties and /or storage of the same if deemed necessary by the City.

5. LIABILITY; Lessor shall not be liable to Lessee or to Lessee's guests, visitors, or any other person for any injury or damage to persons or property arising from any cause whatsoever which shall occur in any manner on or about the premises in connection with or arising out of Lessee's occupation and use of the premises. Lessee agrees to indemnify and save harmless Lessor from any claim for damage which may occur in any manner in or about premises, including reasonable attorney's fees.

6. USE OF PREMISES; Lessee shall use the leased premises for storage of aircraft and related purposes. Use of the premises for any other purpose shall constitute a breach of this agreement and shall be grounds for termination. Lessee shall not use the premises for any purpose prohibited by laws of the United States of America, the State of New Mexico, or ordinances of Roosevelt County and the City of Portales. Lessee shall prevent the performance of any act or creation of anything which in the exclusive opinion of the Lessor may become an environmental hazard, a nuisance, noxious or objectionable condition including, but not limited to, anything resulting in noise, smoke, dust, odor, air pollution or other condition, substance, or element in such amount to affect the surrounding area. Use of the premises for commercial use must have approval of the airport manager.

7. SECURITY; Lessee shall be responsible for the security of its leased premises  and any privately owned property. Overnight parking of vehicles outside the T-hangers shall be permitted in designated areas only.

8. ASSIGNMENT and SUBLEASE; Lessee shall not assign nor sublet the premises or any portion thereof. Lessee shall prove ownership of aircraft upon request of Lessor.

9. AGREEMENT; The Lessee agrees to comply with all rules and regulations of Portales airport relating to use and occupancy of the premises.

10. INSPECTION; Lessor may, with prior notice to the Lessee, enter and inspect the leased premises for the purpose of ensuring Lessee's compliance with its obligation under this agreement. In the event of an emergency, the Lessor may enter the leased premises without prior notice.

11. If unused hangers are available they can be rented for storage with approval from the Airport manager. However if said hanger is needed for any aircraft or aviation related business or vehicle the lessee will have 15 days after notice to vacate hangar without further recourse. Lessee gives express permission to the Portales airport and its agents to enter the hangar after 15 days and remove any properties contained therein. Lessee further recognizes and agrees that if lessee fails to remove such property that the airport at its option may sell or dispose of any property left therein. Lessor agrees that in the event such property is sold, that proceeds received from the sale shall be applied to any unpaid rent, costs charges, and/or attorney's fees incurred by the airport with the balance to be returned to lessee. Lessee further agrees that it waves any claim for damages arising from the removal of such property.

3

LESSEE SIGNATURE _____

LESSOR AGENT SIGNATURE _____

Lessee information; Mailing address _____

phone # ____ ██████████████████

LEONARD VANDENBERG

██████████████████

██████████████████

Exhibit 2



| American Cattle CO. LLC | Bruce Nixon |
|---|---|
|  |  |

| A1 | A2 | A3 | A4 | A5 |
|---|---|---|---|---|
| Tyler Brown | Christopher Evanoff | Richard Seddon | Romeo Tcheutchua | Keane Brown |
| Robert Love | O. Dale Miller | Leonard Vandenberg | Peter Thompson | Art Kennedy |

| B1 | B2 | B3 | B4 | B5 |
|---|---|---|---|---|

| C1 | C2 | C3 | C4 | C5 |
|---|---|---|---|---|
| Robert Love | Charles Donnell | Robert Love | Bruce Nixon | Russell Cook |
| US Flight Academy | Arlan Schmitz | Herbert Porter | Kevin Breshears | Stephen Heath |

| D1 | D2 | D3 | D4 | D5 |
|---|---|---|---|---|

| E1 | E2 | E3 | E4 | E5 |
|---|---|---|---|---|
| Johnnie Firestone | (Sunport) US Flight Academy | (Sunport) Empty | ~~Keane Brown~~ Empty | Keane Brown |
| Johnnie Firestone | (Sunport) Empty | (Sunport) Empty | (Sunport) Romeo Tcheutchua | Keane Brown |

| F1 | F2 | F3 |  |  |
|---|---|---|---|---|

3/2/23, 11:23 AM                                   Bing Maps - Directions, trip planning, traffic cameras & more

**b** bing maps

Notes





https://www.bing.com/maps/?cp=34.14885~-103.406681&lvl=19.3&style=a                                1/1

Exhibit 3

AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the

District of New Mexico

| | |
|---|---|
| In the Matter of the Seizure of | ) |
| *(Briefly describe the property to be seized)* | ) |
| 1964 Piper PA-24-250 aircraft, serial number | )    Case No. |
| 24-3660, tail number N8404P | ) |
| | ) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of
_____ New Mexico _____ is subject to forfeiture to the United States of America under ____ 18 ____ U.S.C. §
__ 981(a)(1)(A) __ *(describe the property)*:
1964 Piper PA-24-250 aircraft, serial number 24-3660, tail number N8404P, and all accompanying apparatus to include keys, logbooks, and operating manuals/handbooks, which are subject to forfeiture pursuant to 18 USC §§ 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1).

The application is based on these facts:
See attached affidavi, submitted by FBI Special Agent Robert Balint and approved by AUSA Taylor Hartstein

☑ Continued on the attached sheet.

_____
*Applicant's signature*

Special Agent Robert Balint, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
being telephonically sworn and electronically signed.

Date:  March 20, 2023
_____

_____
*Judge's signature*

City and state:  Albuquerque, NM

Honorable John F. Robbenhaar, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR SEIZURE WARRANT

I, Special Agent Robert T. Balint, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed in this capacity since December 2020.  I am currently assigned to the Albuquerque Division, White Collar Crime Squad, and my primary investigative responsibilities include investigating complex financial crimes.  Throughout my career as a Special Agent with the FBI, I have conducted investigations involving financial crimes to include cases involving wire fraud and theft from the United States Government.

2.      The information set forth in this Affidavit was derived from my own investigation and/or communicated to me by other law enforcement professionals, and from records and documents that I, and others, have reviewed.  I have not included every fact known to me concerning the investigation.  I have set forth only the facts that I believe are necessary to demonstrate probable cause for the issuance of the requested Seizure Warrant.

3.      Based on my training and experience and the facts as set forth in this Affidavit, I submit that there is probable cause to believe that violations of Title 18 United States Code §§ 1343, 1344, 1349, 1956 and 1957 have been committed or facilitated by Leonard Vandenberg and Christy Vandenberg.

4.      From 2020-2022, Christy Vandenberg and/or Leonard Vandenberg (the Vandenbergs) applied for and received approximately $3,145,700.00 in Paycheck Protection Program (PPP) and Economic Injury Disaster Loan (EIDL) loans made available in response to

the Covid-19 pandemic.  The terms and conditions of these loans required that the funds be used

for payroll and operating expenses for businesses controlled by the Vandenbergs.  Information

developed over the course of FBI's investigation indicates that the Vandenbergs instead

transferred a substantial amount of the loan proceeds to multiple personal financial trading

accounts for personal gain.  From approximately March 2020 to approximately September 2022,

the combined value of the brokerage accounts in the Vandenbergs' personal names identified

below grew to approximately $3,066,239.88.  As of December 2022, the combined value of

brokerage accounts in the Vandenbergs' personal names and/or in the Vandenbergs' custody

identified below was approximately $2,888,140.72.  I submit that, based on the facts outlined in

this Affidavit, there is probable cause to believe that the Vandenbergs knowingly included

materially false representations and pretenses in the application materials and loan forgiveness

materials they submitted to the Small Business Administration and third-party lenders in

connection with the PPP and EIDL loans they received, in violation of 18 U.S.C. §§ 1343, 1344,

and 1349.  I further submit that there is probable cause to believe that the actions undertaken by

the Vandenbergs in connection with these loans amounted to a scheme to defraud and money

laundering in violation of Title 18 United States Code §§ 1343, 1344, 1349, 1956 and 1957.

## **PROPERTY FOR SEIZURE**

5.      I make this Affidavit in support of Applications for a Seizure Warrant for the

property contained in the following accounts and items:

>    a.   All funds, monies, securities, and/or financial instruments contained within TD
>
>         Ameritrade Joint Tenants with Rights of Survivorship account ████5235 in the
>
>         name of Leonard C. Vandenberg and Christy J. Vandenberg, with signers Leonard

C. Vandenberg and Christy J. Vandenberg.[1]

b. All funds, monies, securities, and/or financial instruments contained within TD Ameritrade Joint Tenants with Rights of Survivorship account # ███████8240 in the name of Leonard C. Vandenberg and Christy J. Vandenberg, with signers Leonard C. Vandenberg and Christy J. Vandenberg, with investment advisor Fisher Investments.

c. All funds, monies, securities, and/or financial instruments contained within TD Ameritrade individual account ███████3730 in the name of Leonard C. Vandenberg, with signer Leonard C. Vandenberg.

d. All funds, monies, securities, and/or financial instruments contained within TD Ameritrade Minor Individual Retirement Account (IRA) ███████8585 in the name of B.V. and custodian Leonard C. Vandenberg, mailing address ███████ ███████

e. All funds, monies, securities, and/or financial instruments contained within TD Ameritrade Minor Individual Retirement Account (IRA) ███████1306 in the name of D.V. and custodian Leonard C. Vandenberg, mailing address ███████ ███████

f. All funds, monies, securities, and/or financial instruments contained within TD Ameritrade Minor Individual Retirement Account (IRA) ███████7971 in the name of B.V. and custodian Leonard C. Vandenberg, mailing address ███████,

---

[1] The names on the documents are sometimes inconsistent as to the use of a middle initial and whether or not punctuation is used with the middle initial.  For consistency in this Affidavit, whenever a middle initial appears, it is followed by a period whether or not such punctuation was used in the actual records.

███████████ .

g. All funds, monies, securities, and/or financial instruments contained within TD Ameritrade Minor Individual Retirement Account (IRA) ████ 8295 in the name of J.V. and custodian Leonard C. Vandenberg, mailing address ████████ ████████

h. 1964 Piper PA-24-250 aircraft, serial number 24-3660, tail number N8404P, registered to Leonard Vandenberg and Christy Vandenberg, and all accompanying apparatus to include keys, logbooks, and operating manuals/handbooks.

## RELEVANT SEIZURE AND FORFEITURE AUTHORITY

6. I assert that, based upon the facts detailed in this Affidavit, probable cause exists to believe the aforementioned property listed in paragraph 5 constitutes evidence of, proceeds (i.e., fruits) of, and property designed for use, intended for use, or used in, violations of Title 18 U.S.C. §1343 (Wire Fraud), Title 18 U.S.C. §1344 (Bank Fraud), Title 18 U.S.C. §1349 (Conspiracy), Title 18 U.S.C. § 1956 (Laundering of Monetary Instruments), and Title 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity). *See* Fed. R. Crim. P. 41(c)(1)-(3). Additionally, the property listed in paragraph 5 is subject to civil forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(A) and (C) because it represents proceeds of, property involved in, and/or property traceable to violations of 18 U.S.C. §§ 1343, 1344, 1349, 1956 and 1957.

7. Civil forfeiture authority for the abovementioned violations exists under the following:

a. Title 18 U.S.C. § 981(a)(1): "The following property is subject to forfeiture to the United States: (A) Any property, real or personal, involved in a transaction or

attempted transaction in violation of section **1956**, **1957** or 1960 of this title, or any property traceable to such property."  (emphasis added).

b.  Title 18 U.S.C. § 981(a)(1)(C): "Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or **1344** of this title or **any offense constituting a 'specified unlawful activity'** (as defined in section 1956(c)(7) of this title), or a **conspiracy to commit such offense**."[2] (emphasis added).

8.     Title 18 U.S.C. § 982 provides for criminal forfeiture of certain property upon conviction for violations of 18 U.S.C. §§ 1343, 1344, 1349, 1956 and 1957.  Regarding sections 1956 and 1957, "[t]he court, in imposing sentence on a person convicted of an offense in violation of section **1956**, **1957**, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  18 U.S.C. § 982(a)(1) (emphasis added).  Furthermore, if a person is charged in a criminal case with an offense for which the civil or criminal forfeiture of property is authorized, the government may include notice of the forfeiture in an indictment or information and, if the defendant is convicted of the offense giving rise the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case.  *See* 28 U.S.C. §

---

[2] 18 U.S.C. § 1956(c)(7)(A) includes as a "specified unlawful activity" "any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31."  Section 1961(1) specifically lists "**section 1343** (relating to wire fraud)" and "**section 1344** (relating to financial institution fraud)."  (emphasis added).

2461(c).  If the property identified in paragraph 5 is subject to civil forfeiture under 18 U.S.C. §

981(a)(1)(C), therefore, it is also subject to forfeiture in a criminal case by operation of 28

U.S.C. § 2461(c).

## RELEVANT CRIMINAL STATUTES

9.    Title 18 U.S.C. § 1343 provides the following:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication, in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years or both.  If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency . . . or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

10.    Title 18 U.S.C. § 1344 provides the following:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

11.    Title 18 U.S.C. § 1349 provides the following:

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.    Title 18 U.S.C. § 1956(a)(1) provides the following:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (B) knowing that the transaction is designed in whole or in part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the

property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

13.     Title 18 U.S.C. § 1956(h) states that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

14.     Title 18 U.S.C. § 1956(c)(9) defines "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."

15.     Title 18 U.S.C. § 1957(a) provides that "[w]hoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)."  Subsection (d) provides, in relevant part, that "[t]he circumstances referred to in subsection (a) are—(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States."

## BACKGROUND ON CARES ACT, PAYCHECK PROTECTION PROGRAM (PPP) LOANS, AND ECONOMIC INJURY DISASTER LOANS (EIDL)

16.     In March 2020, the Coronavirus Aid, Relief and Economic Security Act, or the "CARES Act," was enacted to provide immediate assistance to individuals, families and organizations affected by the COVID-19 emergency.  The CARES Act provided over $2 trillion in economic relief protections to the American people from the public health and economic impacts of COVID-19.  Among its various provisions, the CARES Act authorized the Small Business Administration (SBA) to guarantee Paycheck Protection Program (PPP) loans, the full principal amount of which could qualify for forgiveness.  The CARES Act authorized up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses.

Additional PPP funding was authorized in legislation enacted on or about December 27, 2020 and March 11, 2021.

17.     The PPP permitted participating third-party lenders to approve and disburse loans to small businesses for "covered expenditures" including payroll costs[3] and certain expenditures on mortgage interest payments, rent, utilities, operations expenditures, property damage costs, supplier costs, and worker protection expenditures.[4]  Although PPP loans were funded by the third-party lenders, the loans were fully guaranteed by the SBA, meaning that in the event of a default, the SBA agreed to fully satisfy the lender for any balance remaining on the loan.  The CARES Act also provided for the SBA to forgive any loan up to 100 percent if the borrower established that it utilized at least 60 percent of the loan proceeds for payroll costs in the 24-week period following loan disbursement and the remaining portion of the loan proceeds, up to 40 percent, for "covered expenditures."  The CARES Act provided for any loan proceeds not spent on payroll costs and "covered expenditures" to be serviced as a loan and ultimately repaid.

18.     The terms of PPP loans did not permit loan proceeds to be used for non-business expenses.  Such unauthorized expenses would include the purchase of consumer goods unrelated to business operations, paying personal debts such as residential mortgage payments and

---

[3] As described in the CARES Act, payroll costs include compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation.

[4] The final four types of expenses in this list (starting with "operations expenditures") were designated as "covered expenditures" starting January 6, 2021, when the scope of such expenditures was expanded by the Economic Aid Act.

automobile loan payments, purchasing automobiles or other vehicles for personal use, making personal investments (including the purchase of assets like securities or cryptocurrency), and funding the retirement accounts of individuals not associated with the borrower's business. Knowing misuse of PPP funds subjected the borrower to additional liability, such as charges for fraud.

19.     The SBA promulgated regulations concerning eligibility for a PPP loan.  To apply for a PPP loan, potential borrowers were required to electronically submit the SBA Form 2483, "Paycheck Protection Program Borrower Application Form" with supporting payroll documentation to a financial institution that administered the loan and served as custodian of the funds.  On the SBA Form 2483, an authorized representative had to make several certifications about the borrower business's operations and related information.  Those certifications included that: (i) the applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099-MISC; (ii) current economic uncertainty made the loan request necessary to support the applicant's ongoing operations; and (iii) the PPP funds would be used to retain workers and to maintain payroll or pay other qualifying expenses.  Potential borrowers also had to provide information including the average monthly payroll expenses of the business and the number of employees it had.  Upon submitting the SBA Form 2483, the authorized representative had to certify that, should he or she knowingly use the PPP funds for unauthorized purposes, the United States could hold him or her legally liable, including by charging him or her criminally for fraud.

20.     The maximum available PPP loan amount was the lesser of $10 million or an amount calculated using a payroll-based formula specified in the CARES Act.  The payroll-based formula principally considered the borrower's aggregate payroll costs from the preceding

twelve months for all domestic employees.[5]  Once an average monthly payroll cost was

established, the borrower multiplied that amount by 2.5 to arrive at the total maximum PPP loan

amount.

21.     Additionally, the applicant had to respond to questions regarding his or her

personal history, including whether he or she had been convicted of a felony and/or placed on

probation within the previous five years.  The PPP loan application expressly stated that, should

the applicant respond "yes," the PPP loan would "not be approved."  The applicant also had to

certify the truth and accuracy of any information provided on the SBA Form 2483 and in all

supporting documents.  Such supporting documents could include tax filings with the Internal

Revenue Service (IRS), such as the IRS Form W-3, "Transmittal of Wage and Tax Statements";

IRS Form 940, "Employer's Annual Federal Unemployment Tax Return"; or IRS Form 941,

"Employer's Quarterly Federal Tax Return," as well as other documents such as payroll

processor records, bank records, or other records demonstrating qualified payroll expenses.

22.     Finally, the applicant had to certify his or her understanding of the following

warning regarding false statements and other criminal penalties:

> I realize that knowingly making a false statement to obtain a guaranteed
> loan from SBA is punishable under the law, including under 18 U.S.C.
> §§ 1001 and 3571 by imprisonment of not more than five years and/or a
> fine of up to $250,000; under 15 U.S.C. § 645 by imprisonment of not
> more than two years and/ or a fine of not more than $5,000; and, if
> submitted to a federally insured institution, under 18 U.S.C. § 1014 by
> imprisonment of not more than thirty years and/or a fine of not more than
> $1,000,000.

23.     After a third-party lender funded a PPP loan to the borrower, the lender submitted

---

[5] The payroll-based formula set out in the CARES Act expressly excludes (i) any compensation
of an employee whose principal place of residence is outside of the United States; and (ii) the
compensation of an individual employee in excess of an annual salary of $100,000, prorated as
necessary.

disbursement details into the SBA E-Tran system with servers located in Sterling, VA.  The

SBA's Denver Finance Center, located in Denver, Colorado, created payment files and

authorized payments of the PPP processing fee to the lender through the US Treasury's Financial

Management System (FMS).  The primary server for the FMS is in Sterling, VA.  The PPP

processing fee varied depending on the amount of the loan.  Once created, the payment files were

then transmitted via wire to the U.S. Treasury disbursing office in Kansas City, Missouri, which

would, in turn, send instructions for payment of funds to the Federal Reserve Bank ACH

processing site in East Rutherford, New Jersey.

24.      The PPP program ended on May 31, 2021.

25.      The Economic Injury Disaster Loan (EIDL) program is an SBA program that

provides low-interest financing to small businesses, renters, and homeowners in regions affected

by declared disasters.

26.      The CARES Act and subsequent legislation, enacted between on or about

December 27, 2020, and on or about March 11, 2021, allocated billions of dollars in COVID-

related EIDL funding.  The CARES Act and subsequent legislation also authorized the SBA to

provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial

disruptions due to the COVID-19 pandemic.  In addition, the CARES Act and subsequent

legislation authorized the SBA to issue advances of up to $10,000 to small businesses within

three days of applying for an EIDL.

27.      To obtain an EIDL, which in some cases included an advance, a qualifying

business had to submit an application to the SBA and provide information about its operations,

such as the number of employees, gross revenues for the 12-month period preceding the disaster,

and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for

COVID-19 relief, the 12-month period was that preceding January 31, 2020.  The applicant also had to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

28.     All EIDL applications were submitted online.  All EIDL applications submitted on or after July 11, 2020 were handled by an SBA contractor with servers located in Des Moines, Iowa.  Prior to July 11, 2020, EIDL applications were submitted through three different servers located in Boydton, Virginia, West Des Moines, Iowa, and Quincy, Washington.  Whether the EIDL loan would be approved and for what amount were determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above.

29.     Once an SBA EIDL application was approved, the SBA's Denver Finance Center,[6] located in Denver, Colorado, created payment files and authorized payments of the EIDL funds based on those applications.  The disbursement of the EIDL funds were transmitted by the Financial Management System to the Treasury and then to the recipient's bank account.  The primary server for the FMS is in Sterling, Virginia.

30.     Any funds issued under an EIDL, including grants and advances, were issued directly by the SBA.  EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

31.     SBA's website describes authorized uses of EIDL proceeds as follows: "Working capital to make regular payments for operating expenses, including payroll, rent/mortgage,

---

[6] Denver Finance Center, OCFO, SBA, 721 19th Street, Suite 373, Denver, CO 80202.

utilities, and other ordinary business expenses, and to pay business debt incurred at any time

(past, present, or future)."  The terms of EIDL loan documents do not permit the use of EIDL

funds for non-business purposes.  Such unauthorized expenditures would include the purchase of

consumer goods unrelated to business operations, paying personal debts such as residential

mortgage payments and automobile loan payments, purchasing automobiles or other vehicles for

personal use, making personal investments (including the purchase of assets like securities or

cryptocurrency), and funding the retirement accounts of individuals not associated with the

borrower's business.  Knowing misuse of EIDL funds subjected the borrower to additional

liability, such as charges for fraud.

32.     Borrowers applying for EIDL loans and modifications were required to submit an

executed Loan Authorization and Agreement (LA&A) form in connection with each EIDL loan

and modification.  This form indicated that "[a] properly signed document [i.e., the LA&A] is

required <u>prior</u> to any disbursement."  The LA&A also contained various representations,

including representations regarding authorized uses of the loan proceeds, to which borrowers

were required to agree prior to any loan disbursement.

## <u>PROBABLE CAUSE</u>

33.     Leonard Vandenberg and Christy Vandenberg, residents of New Mexico and/or

Texas, collectively caused at least two PPP and three EIDL COVID relief loan applications to be

submitted with financial institutions and with the SBA between 2020 and 2022.  The loan

applications were made in the names of various companies.

34.     These loan applications were approved and the loans were funded for a total of approximately $3,145,700.00 with the loan proceeds being directed to three bank accounts at James Polk Stone Community Bank (JP Stone) and two bank accounts at City Bank.[7]

35.     JP Stone is a lender that disbursed PPP loan funds to bank accounts controlled by Leonard Vandenberg and Christy Vandenberg.  The loan agreements appear to have been signed by Leonard Vandenberg and Christy Vandenberg.

36.     A search of the New Mexico Secretary of State Corporations and Business Services and Texas Comptroller of Public Accounts revealed corporate records exist for the companies that applied for COVID relief loans.  More specifically:

    a.  Corclyn Enterprises Inc. was organized in New Mexico on or about May 4, 2000 and lists Leonard Vandenberg as the Registered Agent.  Leonard Vandenberg is listed as President and Director, and Christy Vandenberg is listed as Secretary.

    b.  LCV Real Estate LLC was organized in New Mexico on or about April 26, 2018 and lists Leonard Vandenberg as the Registered Agent, Organizer, and Member. Christy Vandenberg is listed as a Member.

    c.  SDGTEX Restaurants Inc. was registered in Texas on or about February 14, 2008 and lists Leonard Vandenberg as president and director and Christy Vandenberg as vice president and director.  National Registered Agents, Inc. is listed as the agent.

---

[7] A chart summarizing the disposition of the COVID relief loan proceeds is attached as Exhibit 1A.  A chart summarizing the bank accounts and trading accounts described in this Affidavit is attached as Exhibit 1B.  A chart providing a visual depiction of the flow of funds is attached as Exhibit 1C.

37.     As explained herein, Corclyn Enterprises Inc. and SDGTEX Restaurants Inc. are associated with restaurants in various locations in New Mexico and Texas all operating under the name Something Different Grill.  An open-source search found that there are approximately seven Something Different Grill restaurants with locations in Clovis, NM; Portales, NM; Levelland, TX; Muleshoe, TX; and Lubbock, TX. An open-source search did not yield any online presence for LCV Real Estate LLC.

<u>**Loan Applications Submitted to SBA and JP Stone by Leonard Vandenberg and Christy Vandenberg**</u>

38.     In support of the loan applications, certain documentation was provided to the SBA and financial institutions that processed the loans.  The investigation has obtained records from the SBA and from various financial institutions.  The following paragraphs demonstrate that the PPP and EIDL loan application materials submitted to third-party lenders and the SBA by Leonard Vandenberg and Christy Vandenberg on behalf of their business entities contained materially false and/or fraudulent pretenses and representations.  The same is true of the loan forgiveness applications submitted in connection with the PPP loans.

***PPP Loan Number 346009 Funded on April 17, 2020 (Exhibit 1A Reference #1)***

39.     Records obtained from JP Stone show that Leonard Vandenberg and Christy Vandenberg applied for a PPP loan on or about April 2, 2020, obtaining loan proceeds for Corclyn Enterprises Inc. dba Something Different Grill in the amount of approximately $300,000.00 from JP Stone.  In signing the loan application, Leonard Vandenberg and Christy Vandenberg agreed the loan proceeds would be used "only for the business-related purposes as specified in the loan application."

40.     The PPP Loan Application Form is attached as Exhibit 2.  Certifications that the applicant must initial include "The funds will be used to retain workers and maintain payroll or

make mortgage payments, lease payments, and utility payments; I understand that if the funds

are used for unauthorized purposes, the federal government may pursue criminal fraud charges."

Exhibit 2 at 2.

41.     According to a PPP Loan Forgiveness Application Form 3508EZ, Leonard

Vandenberg applied for loan forgiveness on or about November 27, 2020.  The PPP loan

forgiveness application is attached as Exhibit 3.

42.     The PPP Loan Forgiveness Application Form contains the following

representations, among others:

> The dollar amount for which forgiveness is requested:
> - was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);
> - includes payroll costs equal to at least 60% of the forgiveness amount;
>
> ***
>
> I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.
>
> ***
>
> The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.
>
> ***
>
> The Borrower was unable to operate between February 15, 2020, and the end of the Covered Period at the same level of business activity as before February 15, 2020 due to compliance with requirements established or guidance issued between March 1, 2020 and December 31, 2020, by the Secretary of Health and Human Services, the Director of the Centers for Disease Control and Prevention, or the Occupational Safety and Health Administration, related to the maintenance of standards of sanitation, social distancing, or any other work or customer safety requirement related to COVID-19.

Exhibit 3 at 2.  These representations appear to have been individually certified (by initials) by Leonard Vandenberg.  Leonard Vandenberg also signed the PPP Loan Application Forgiveness Form as the authorized representative of the borrower.  *Id.*

43.     Records obtained from JP Stone indicate that the PPP loan was forgiven in part on or about December 17, 2020 and in full on or about February 10, 2021.

44.     As explained in the financial analysis below, the PPP Loan Application Form and the PPP Loan Application Forgiveness Form submitted in relation to this loan contain materially false and fraudulent representations and pretenses.  Financial records associated with Corclyn Enterprises demonstrate that the business was not, in fact, unable to operate during at the same level as it had prior to the pandemic and, even setting aside this PPP loan, the business was more profitable in 2020 and 2021 than it had been in 2019.  Moreover, financial analysis conducted by the FBI demonstrates that portions of the PPP loan (which was received in April of 2020) were used for unauthorized purposes, including to fund transfers totaling $300,000.00 (beginning in May of 2020) from the business's bank account to a Robinhood investment account owned by Leonard Vandenberg, the contents of which subsequently went to fund various TD Ameritrade investment accounts associated with Leonard Vandenberg and owned by him and other members of his family.

45.     Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that the scheme by which Leonard and/or Christy Vandenberg obtained PPP loan proceeds from this loan and used them to enrich themselves and members of their family violated 18 U.S.C. §§ 1343, 1344, 1349, 1956, and 1957.

*PPP Loan Number 346242 Funded on May 26, 2020 (Exhibit 1A Reference #2)*

46.     Records obtained from JP Stone show that Leonard Vandenberg and Christy Vandenberg applied for a PPP loan on or about May 13, 2020, obtaining PPP loan proceeds for SDGTEX Restaurants Inc. dba Something Different Grill in the amount of approximately $50,000.00 from JP Stone.  The PPP Loan Application Form is attached as Exhibit 4.  In signing the loan application, Leonard Vandenberg and Christy Vandenberg agreed the loan proceeds would be used "only for the business related purposes as specified in the loan application." Exhibit 4 at 2

47.     Other certifications that the applicant must initial include "The funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges." *Id.*

48.     According to a PPP Loan Forgiveness Application Form 3508EZ, Leonard Vandenberg applied for loan forgiveness on or about December 15, 2020. The PPP loan forgiveness application is attached as Exhibit 5.

49.     The PPP Loan Forgiveness Application Form submitted in connection with this loan contains substantially identical representations as the form discussed above in paragraph 42. Exhibit 5 at 1-2.  The representations in this form also appear to have been individually certified (by initials) by Leonard Vandenberg, and Leonard Vandenberg signed the form as an authorized representative of the borrower. *Id.*

50.     Records obtained from JP Stone indicate that the PPP loan was forgiven on or about January 14, 2021.

51.     As explained in the financial analysis below, the PPP Loan Application Form and the PPP Loan Application Forgiveness Form submitted in relation to this loan contain materially false and fraudulent representations and pretenses.  Financial records associated with SDGTEX Restaurants Inc. demonstrate that the PPP loan proceeds were not used to cover payroll costs and other business expenses of SDGTEX Restaurants Inc., as represented, but instead were directed to (1) a bank account owned by Corclyn Enterprises, (2) another bank account owned by Leonard and Christy Vandenberg, and (3) an account-closing withdrawal of all remaining funds.

52.     Based on the facts set forth in this Affidavit, I submit that there is probable cause to believe that the scheme by which Leonard and/or Christy Vandenberg obtained PPP loan proceeds from this loan and used them to enrich themselves, other members of their family, and other businesses they owned violated 18 U.S.C. §§ 1343, 1344, 1349, 1956, and 1957.

***EIDL Loan Number 8227677400 Funded on May 18, 2020 (Exhibit 1A Reference #3)***

53.     Leonard Vandenberg and Christy Vandenberg submitted an intake loan application to the SBA on behalf of Corclyn Enterprises on or about March 30, 2020.  In the application, Leonard Vandenberg and Christy Vandenberg asserted that Corclyn Enterprises dba Something Different Grill is a restaurant business located at 405 West 4th in Portales, New Mexico.  Leonard Vandenberg and Christy Vandenberg each claimed 50% ownership of Corclyn Enterprises and claimed that Corclyn employed 112 individuals, earned $4,100,000.00 in gross revenues and had $1,234,354.00 in cost of goods sold for the 12 months prior to the disaster.

54.     The EIDL intake application form submitted in connection with this loan, attached as Exhibit 6, included the following text:

> CERTIFICATION AS TO TRUTHFUL INFORMATION: By signing this application, you certify that all information in your application and submitted with your application is true and correct to the best of your knowledge, and that you will submit truthful information in the future.

Exhibit 6 at 4.

The application also included the following text:

> WARNING: Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C. 636(b).  In addition, any false statement or misrepresentation to SBA may result in criminal, civil, or administrative sanctions including, but not limited to: 1) fines and imprisonment, or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement ad non-procurement transactions.  Statutory fines may increase if amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

*Id*.  The borrower on this loan also requested two modifications ("Mods"), each of which required an additional EIDL intake application form to be submitted to SBA, containing substantially identical representations to those set out above in this paragraph.  Each of the EIDL intake application forms had to be certified under penalty of perjury by a representative of the borrower (i.e., Leonard and/or Christy Vandenberg).

55.     The EIDL application materials associated with this loan also contained an LA&A submitted on behalf of Corclyn Enterprises and executed by Leonard Vandenberg, attached as Exhibit 7.  The LA&A contained a provision entitled "use of loan proceeds," which reads as follows:

> Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter and to pay Uniform Commercial Code lien filing fees and third-party UCC handling charge of $100 which will be deducted from the Loan amount stated above.

Exhibit 7 at 3.  The LA&A also contained a provision titled "Limits on distribution of assets," which reads as follows:

> Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company.

*Id.* at 5.  The LA&A also contains a provision titled "Borrower certifications," which includes

the following representation:

> All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan.

*Id.* at 5.  The LA&A also contains a provision titled "Civil and criminal penalties," which reads

as follows:

> Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C. 636(b). In addition, any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines, imprisonment or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions. Statutory fines may increase if amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

*Id.* at 6.  Finally, the LA&A contains a jurat preceding the signature of the representative of the

borrower, which reads as follows:

> The undersigned agree(s) to be bound by the terms and conditions herein during the term of this Loan, and further agree(s) that no provision stated herein will be waived without prior written consent of SBA.  **Under penalty of perjury of the United States of America, I hereby certify that I am authorized to apply for an obtain a disaster loan on behalf of Borrower, in connection with the effects of the COVID-19 emergency.**

*Id.* at 7.

56.     SBA records show that three modifications or "mods" were funded.  The LA&A for Mod 0 appears to have been executed by Leonard Vandenberg digitally via Docusign on May 18, 2020.  The LA&A for Mod 1 appears to have been executed by Leonard Vandenberg and on May 18, 2020.  The LA&A for Mod 2 appears to have been executed by Leonard Vandenberg and Christy Vandenberg on May 12, 2022.  Each of these LA&As contains representations that are substantially identical to the representations set out in paragraph 55.  The LA&A's identify both Leonard and Christy Vandenberg as "Owner/Officer."

57.     Mod 0 was funded in the amount of $150,000.00.  Mod 1 was funded in the amount of $1,200,000.  Mod 2 was funded in the amount of $2,000,000.00.

58.     On or about April 10, 2020, $10,000.00 was disbursed as an EIDL advance to JP Stone account ending in 7426 (JP 7426).  On or about May 18, 2020, $149,900.00 was disbursed to JP 7426.  On or about April 20, 2022, $1,050,000.00 was disbursed to JP 7426.  On or about May 15, 2022, $800,000.00 was disbursed to JP 7426.

59.     The total amount disbursed from this loan to JP 7426 was approximately $2,009,900.00.

60.     As explained in the financial analysis set out below, the EIDL intake applications and the LA&As submitted in relation to this loan and the related "Mods" contain materially false and fraudulent representations and pretenses.  Financial records associated with Corclyn Enterprises demonstrate that the EIDL proceeds were not used to cover operating expenses and other business expenses of Corclyn Enterprises, as represented, but instead were substantially used to fund investment accounts associated with Leonard Vandenberg and owned by Leonard Vandenberg and other members of his family.  Funds were also comingled in a JP Stone bank account ending in 7426, which belonged to Corclyn Enterprises, before funds from this account

were used to pay off a loan collateralized by a private aircraft owned by Leonard and Christy

Vandenberg and believed to be operated by Leonard Vandenberg, who is a licensed pilot.

61.     Based on the facts set out in this Affidavit, I submit that there is probable cause to

believe that the scheme by which Leonard and/or Christy Vandenberg obtained EIDL loan

proceeds from this loan and used those proceeds to enrich themselves and other members of their

family, including by funding investment accounts and paying off a loan collateralized by a

private aircraft, violated 18 U.S.C. §§ 1343, 1349, 1956, and 1957.

***EIDL Loan Number 8464537408 Funded on May 26, 2020 (Exhibit 1A Reference #4)***

62.     Leonard Vandenberg and Christy Vandenberg submitted an intake loan

application to the SBA on or about March 30, 2020.  In the application, Leonard Vandenberg and

Christy Vandenberg asserted LCV Real Estate is a real estate business located at 405 West 4th in

Portales, New Mexico.  Leonard Vandenberg and Christy Vandenberg each claimed 50%

ownership of LCV Real Estate and that LCV Real Estate employed 2 individuals, earned

$122,800.00 in gross revenues, had $97,000.00 in cost of goods sold for the 12 months prior to

the disaster, and lost $13,000.00 in rents due to the disaster.

63.     An EIDL intake application was submitted to SBA on behalf of LCV Real Estate

on March 30, 2020.  This EIDL intake application included representations substantially

identical to the representations set out in paragraph 54.  Additional EIDL intake Applications

containing substantially identical representations were submitted to SBA on behalf of LCV Real

Estate in connection with the "Mods" identified below.

64.     An LA&A was submitted to SBA on behalf of LCV Real Estate as part of the

loan application materials for this EIDL loan on May 18, 2020.  The LA&A contained

representations substantially identical to those set out in paragraph 55.  The LA&A appears to

have been executed electronically by Leonard Vandenberg.

65.     SBA records show that three "mods" were funded.  The LA&A for Mod 0

appears to have been executed by Leonard Vandenberg digitally via Docusign on May 18, 2020.

The LA&A for Mod 1 appears to have been executed by Leonard Vandenberg and Christy

Vandenberg on April 7, 2022.  The LA&A for Mod 2 appears to have been executed by Leonard

Vandenberg and Christy Vandenberg on May 4, 2022.  The LA&A's identify both Leonard and

Christy Vandenberg as "Owner/Officer."

66.     Mod 0 was funded in the amount of $11,000.00.  Mod 1 was funded in the

amount of $24,000.00.  Mod 2 was funded in the amount of $275,000.00.

67.     On or about April 15, 2020, $2,000.00 was disbursed as an EIDL advance to JP

Stone account ending in 7412 (JP 7412).  On or about May 26,2020, $11,000.00 was disbursed

to #JP 7412.  On or about April 10, 2022, $13,000.00 was disbursed to JP 7412.  On or about

May 7, 2022, $250,900.00 was disbursed to JP 7412.

68.     The total amount disbursed from this loan to JP 7412 was approximately

$276,900.00.

69.     As explained in the financial analysis set out below, the EIDL intake applications

and the LA&As submitted in relation to this loan and the associated "Mods" contain materially

false and fraudulent representations and pretenses.  Financial records associated with LCV Real

Estate demonstrate that the EIDL proceeds were not used to cover operating expenses and other

business expenses of LCV Real Estate, as represented, but instead were substantially used to

fund investment accounts associated with Leonard Vandenberg and owned by Leonard

Vandenberg and other members of his family.  EIDL proceeds may also have been used to fund the purchase of real property, including a new "Something Different Grill" location.

70.    Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that the scheme by which Leonard and/or Christy Vandenberg obtained EIDL loan proceeds from this loan and used those proceeds to (1) enrich themselves and other members of their family, and (2) purchase real property on behalf of themselves and/or one or more businesses they owned violated 18 U.S.C. §§ 1343, 1349, 1956, and 1957.

***EIDL Loan Number 7701747401 Funded on May 17, 2020 (Exhibit 1A Reference #5)***

71.    Leonard Vandenberg and Christy Vandenberg submitted an intake loan application to the SBA on or about March 30, 2020.  In the application, Leonard Vandenberg and Christy Vandenberg asserted SDGTEX Restaurants Inc., trade name Something Different Grill, is a restaurant business located at 405 West 4th in Portales, New Mexico.  Leonard Vandenberg and Christy Vandenberg both claimed 50% ownership of SDGTEX Restaurants and that SDGTEX Restaurants employed 47 individuals, earned $1,622,459.00 in gross revenues and had $539,306.00 in cost of goods sold for the 12 months prior to the disaster.

72.    An EIDL intake application was submitted to SBA on behalf of SDGTEX Restaurants Inc. on March 30, 2020.  This EIDL intake application included representations substantially identical to the representations set out in paragraph 54.  Additional EIDL intake Applications containing substantially identical representations were submitted to SBA on behalf of SDGTEX in connection with the "Mods" identified below.

73.    An LA&A was submitted to SBA on behalf of LCV Real Estate as part of the loan application materials for this EIDL loan on May 17, 2020.  The LA&A contained

representations substantially identical to those set out in paragraph 55.  The LA&A appears to

have been executed electronically by Leonard Vandenberg.

74.     SBA records show that two modifications or "mods" were funded.  The LA&A

for Mod 0 appears to have been signed by Leonard Vandenberg digitally via Docusign on May

17, 2020.  The LA&A for Mod 1 appears to have been signed by Leonard Vandenberg and

Christy Vandenberg on April 12, 2022.[8]

75.     The LA&A's identify both Leonard and Christy Vandenberg as "Owner/Officer."

76.     Mod 0 was funded in the amount of $150,000.00.  Mod 1 was funded in the

amount of $499,000.00.  Mod 2 was declined.

77.     On or about April 15, 2020, $10,000.00 was disbursed as an EIDL advance to

City Bank account #ending in 0686 (CB 0686).  On or about May 17, 2020, $149,900.00 was

disbursed to City Bank account ending in 0472 (CB 0472) .  On or about April 15, 2022,

$349,000.00 was disbursed to CB 0472.

78.     The total amount disbursed from this loan was approximately $508,900.00.

79.     As explained in the financial analysis set out below, the EIDL intake applications

and the LA&As submitted in relation to this loan and the associated "Mods" contain materially

false and fraudulent representations and pretenses.  Financial records associated with SDGTEX

Inc. dba Something Different Grill demonstrate that the EIDL proceeds were not used entirely to

cover operating expenses and other business expenses of the business, as represented, but instead

---

[8] The documentation provided to the United States by SBA did not include an executed LA&A in
relation to Mod 2 of this loan, which was declined.  It is possible that Mod 2 was declined
*because* no executed LA&A was submitted; it is also possible that the executed LA&A was
omitted from the information provided to the United States and that Mod 2 was declined for
some other reason.

were substantially used to fund investment accounts associated with Leonard Vandenberg and owned by Leonard Vandenberg and other members of his family.

80.     Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that the scheme by which Leonard and/or Christy Vandenberg obtained EIDL loan proceeds from this loan and used those proceeds to enrich themselves and other members of their family violated 18 U.S.C. §§ 1343, 1349, 1956, and 1957.

### JP Stone Accounts for Corclyn Enterprises, LCV Real Estate, SDGTEX Restaurants, and Leonard and Christy Vandenberg

***JP Stone Account in the name of Corclyn Enterprises ending in 7426***:

81.     During the investigation, agents obtained bank account information for a JP Stone Bank account in the name of Corclyn Enterprises Inc. ending in 7426 (JP 7426).  JP 7426 is a business account whose signers are listed as Leonard Vandenberg, Christy Vandenberg, J.P., and C.P.[9]  The account was opened on or about September 18, 2008.  An analysis of this account shows deposits of approximately $2,309,900.00 in PPP and EIDL loan proceeds as reflected in Exhibit 1A.

82.     The following chart summarizes the COVID relief loan proceeds deposited into JP 7426:

| Business Entity | Date | Amount | Loan Type | Loan Number |
|---|---|---|---|---|
| Corclyn Enterprises DBA Something Different Grill | 4/17/2020 | $300,000.00 | PPP | 346009 |
| Corclyn Enterprises DBA Something Different Grill | 4/13/2020 | $10,000.00 | EIDL | 8227677400 |

[9] A review of the relevant records indicates that J.P. and C.P. are family members of Christy Vandenberg.

| Corclyn Enterprises DBA Something Different Grill | 5/19/2020 | $149,900.00 | EIDL | 8227677400 |
|---|---|---|---|---|
| Corclyn Enterprises DBA Something Different Grill | 4/22/2022 | $1,050,000.00 | EIDL | 8227677400 |
| Corclyn Enterprises DBA Something Different Grill | 5/17/2022 | $800,000.00 | EIDL | 8227677400 |
| | **TOTAL** | **$2,309,900.00** | | |

83.     FBI personnel conducted a financial analysis for JP 7426 covering the time period between January 2019 and December 2022.  FBI personnel identified account credits and grouped what appeared to be legitimate business deposits (CR).  FBI personnel identified account debits including vendor payments, payroll, and taxes and grouped them as expenses (DR).  The figures below do not include the above-mentioned PPP/EIDL loan proceed or transfers to brokerage services such as TD Ameritrade and Robinhood (that is to say, it summarizes what the account activity would have been absent the COVID relief loans and subsequent transfers to brokerage accounts) .

JP 7426- Corclyn Enterprises dba Something Different Grill

| Years | Amount (CR) | Amount (DR) | Sum of Net Activity |
|---|---|---|---|
| 2019 Total | $    4,822,809.41 | $  (4,770,127.32) | $       52,682.09 |
| 2020 Total | $    5,516,736.60 | $  (5,378,603.52) | $     138,133.08 |
| 2021 Total | $    6,321,277.35 | $  (6,019,116.48) | $     302,160.87 |
| 2022 Total | $    6,398,992.28 | $  (6,312,501.53) | $       86,490.75 |
| Grand Total | $  23,059,815.64 | $ (22,480,348.85) | $     579,466.79 |

84.     As indicated above, even without the COVID relief loans, the business was more profitable in 2020 and 2021 than it had been in 2019.[10]  This contradicts the representations made in the PPP Loan Forgiveness Application associated with this loan, including representations that the business was unable to operate after February 2020 at the same level it had operated prior to the pandemic.  *See* ¶ 42; Exhibit 3 at 2.

85.     In 2019, monthly revenue averaged approximately $401,900.78.  Monthly expenses averaged approximately $397,510.61.  Monthly net balances, or "profits," averaged approximately $4,390.17.  Total profits for the year were approximately $52,682.09.

86.     In 2020, monthly revenue averaged approximately $459,728.05.  Monthly expenses averaged approximately $448,216.96.  Monthly profits averaged approximately $11,551.09. Total profits for the year were approximately $138,133.08.

87.     In 2021, monthly revenue averaged approximately $526,773.11. Monthly expenses averaged approximately $501,593.04. Monthly profits averaged approximately $25,180.07.  Total profits for the year were approximately $302,160.87.

---

[10] This increase in profitability would make sense if, as indicated by the activity observed in the operating account, the business remained open when other restaurant businesses, including competitors, suspended or narrowed business operations due to the pandemic.

88.     In 2022, monthly revenue averaged approximately $533,249.36.  Monthly expenses averaged approximately $526,041.79.  Monthly profits averaged approximately $7,207.56.  Total profits for the year were approximately $86,490.75.  According to bank records, JP 7426 (owned by Corclyn Enterprises) received a deposit of approximately $569,922.27 on September 6, 2022.  The corresponding deposit slip includes a handwritten note that appears to read "IRS ERC."  This may relate to an "IRS Employee Retention Credit," which is a program providing a refundable tax credit to eligible employers for keeping employees on their payroll despite the economic hardship occasioned by the COVID 19 pandemic.  The "IRS ERC" deposit is included in the 2022 net operating profit of $86,490.75.

89.     Table 1 details the debit and credit activity and daily balance calculated for JP 7426, *including* the receipt of PPP/EIDL funds in April-May 2020 and April-May 2022, the periods during which the proceeds of all 5 of the PPP and EIDL loans discussed in this Affidavit were disbursed.  The daily balances below *also include* transfers made to brokerage accounts in the name of Leonard and Christy Vandenberg.

Table 1

| Years | Day | Amount (CR) | Amount (DR) | Net Balance | Daily Balance (Calculated) |
|-------|-----|-------------|-------------|-------------|----------------------------|
| 2020 | 13-Apr | $49,416.26 | ($17,407.28) | $32,008.98 | $215,452.29 |
| 2020 | 14-Apr | $50.00 | ($31,519.06) | ($31,469.06) | $183,983.23 |
| 2020 | 15-Apr | $17,350.84 | ($6,374.37) | $10,976.47 | $194,959.70 |
| 2020 | 16-Apr | $14,675.76 | ($58,337.58) | ($43,661.82) | $151,297.88 |
| 2020 | 17-Apr | $317,177.69 | ($576.45) | $316,601.24 | $467,899.12 |
| 2020 | 20-Apr | $55,100.76 | ($5,466.86) | $49,633.90 | $517,533.02 |
| 2020 | 21-Apr | $14,096.28 | ($82.64) | $14,013.64 | $531,546.66 |
| 2020 | 22-Apr | $12,037.71 | ($33,696.69) | ($21,658.98) | $509,887.68 |
| 2020 | 19-May | $168,417.13 | ($46,818.88) | $121,598.25 | $686,599.30 |
| 2020 | 20-May | $17,255.00 | $0.00 | $17,255.00 | $703,854.30 |
| 2020 | 21-May | $15,529.71 | ($5,333.37) | $10,196.34 | $714,050.64 |
| 2020 | 22-May | $18,902.76 | ($27,108.19) | ($8,205.43) | $705,845.21 |

| 2020 | 26-May | $69,996.11 | ($41,070.60) | $28,925.51 | $734,770.72 |
| 2020 | 27-May | $13,704.53 | ($75,365.22) | ($61,660.69) | $673,110.03 |
| 2020 | 28-May | $14,852.27 | ($145,753.04) | ($130,900.77) | $542,209.26 |
| 2020 | 29-May | $17,313.05 | ($28,195.26) | ($10,882.21) | $531,327.05 |
| 2022 | 22-Apr | $1,066,139.75 | ($8,100.00) | $1,058,039.75 | $1,313,955.39 |
| 2022 | 25-Apr | $48,637.21 | ($250,865.51) | ($202,228.30) | $1,111,727.09 |
| 2022 | 26-Apr | $14,689.01 | ($252,240.63) | ($237,551.62) | $874,175.47 |
| 2022 | 27-Apr | $16,984.81 | ($351,321.41) | ($334,336.60) | $539,838.87 |
| 2022 | 17-May | $817,120.91 | ($135,381.68) | $681,739.23 | $945,762.01 |
| 2022 | 18-May | $15,221.99 | ($5,536.64) | $9,685.35 | $955,447.36 |
| 2022 | 19-May | $17,686.75 | ($40,550.08) | ($22,863.33) | $932,584.03 |
| 2022 | 20-May | $14,818.24 | ($8,091.06) | $6,727.18 | $939,311.21 |

90.     The following chart depicts outflows over time from JP 7426 into the named brokerage accounts.  *See* Exhibit 1B (reference chart for relevant accounts).  Outflows also include a single transfer to USAlliance.  As further explained below, this transfer constitutes a loan payoff associated with a private plane belonging to Leonard and Christy Vandenberg and believed to be operated by Leonard Vandenberg, who is a licensed pilot.

| TRANSACTION DESCRIPTION | PAYEE | DATE(s) | AMOUNT |
| --- | --- | --- | --- |
| **ACH Transfers** | Vandenberg Robinhood 3505 | 5/2020 – 1/2021 | $330,000.00 |
| **ACH Transfers** | Vandenberg TD Ameritrade 5235 | 2/2/2021-6/10/2022 | $970,000.00 |
| **ACH Transfers** | Vandenberg TD Ameritrade 3730 | 4/25/2022-9/15/2022 | $1,950,000.00 |
| **ACH Transfer** | USAlliance | 5/17/2022 | $63,980.33 |

91.     Table 2 details the debit and credit activity with the daily balance calculated for JP 7426, *excluding* the receipt of the PPP and EIDL loan proceeds in April-May 2020 and April-May 2022.  The daily balances below *include* transfers made to brokerage accounts in the name of Leonard and/or Christy Vandenberg.  The table demonstrates that, without the PPP and EIDL loan proceeds that were deposited into the business account, the transfers to brokerage accounts

would have resulted in JP 7426 attaining a negative balance, reaching approximately negative

$1.75 million in May of 2022.

Table 2

| Years | Day | Amount (CR) | Amount (DR) | Net Balance | Daily Balance (Calculated) |
|-------|-----|-------------|-------------|-------------|----------------------------|
| 2020 | 13-Apr | $39,416.26 | ($17,407.28) | $22,008.98 | $104,950.59 |
| 2020 | 14-Apr | $50.00 | ($31,519.06) | ($31,469.06) | $73,481.53 |
| 2020 | 15-Apr | $17,350.84 | ($6,374.37) | $10,976.47 | $84,458.00 |
| 2020 | 16-Apr | $14,675.76 | ($58,337.58) | ($43,661.82) | $40,796.18 |
| 2020 | 17-Apr | $17,177.69 | ($576.45) | $16,601.24 | $57,397.42 |
| 2020 | 20-Apr | $55,100.76 | ($5,466.86) | $49,633.90 | $107,031.32 |
| 2020 | 21-Apr | $14,096.28 | ($82.64) | $14,013.64 | $121,044.96 |
| 2020 | 22-Apr | $12,037.71 | ($33,696.69) | ($21,658.98) | $99,385.98 |
| 2020 | 19-May | $18,517.13 | ($46,818.88) | ($28,301.75) | $126,197.60 |
| 2020 | 20-May | $17,255.00 | $0.00 | $17,255.00 | $143,452.60 |
| 2020 | 21-May | $15,529.71 | ($5,333.37) | $10,196.34 | $153,648.94 |
| 2020 | 22-May | $18,902.76 | ($27,108.19) | ($8,205.43) | $145,443.51 |
| 2020 | 26-May | $69,996.11 | ($41,070.60) | $28,925.51 | $174,369.02 |
| 2020 | 27-May | $13,704.53 | ($75,365.22) | ($61,660.69) | $112,708.33 |
| 2020 | 28-May | $14,852.27 | ($145,753.04) | ($130,900.77) | ($18,192.44) |
| 2020 | 29-May | $17,313.05 | ($28,195.26) | ($10,882.21) | ($29,074.65) |
| 2022 | 22-Apr | $16,139.75 | ($8,100.00) | $8,039.75 | ($563,709.00) |
| 2022 | 25-Apr | $48,637.21 | ($250,865.51) | ($202,228.30) | ($765,937.30) |
| 2022 | 26-Apr | $14,689.01 | ($252,240.63) | ($237,551.62) | ($1,003,488.92) |
| 2022 | 27-Apr | $16,984.81 | ($351,321.41) | ($334,336.60) | ($1,337,825.52) |
| 2022 | 17-May | $17,120.91 | ($135,381.68) | ($118,260.77) | ($1,731,902.38) |
| 2022 | 18-May | $15,221.99 | ($5,536.64) | $9,685.35 | ($1,722,217.03) |
| 2022 | 19-May | $17,686.75 | ($40,550.08) | ($22,863.33) | ($1,745,080.36) |
| 2022 | 20-May | $14,818.24 | ($8,091.06) | $6,727.18 | ($1,738,353.18) |

92.     As shown by the tables above, transfers from the Corclyn Enterprises account to

brokerage accounts owned by Leonard and/or Christy Vandenberg would not have been

financially feasible absent the receipt of PPP/EIDL loans.  This demonstrates that the PPP and

EIDL loan proceeds were substantially used to fund the brokerage accounts.  Furthermore, the

proximity of these transfers to the submission of loan application and loan modification

documents and the receipt of loan proceeds in April/May of 2020 and April/May of 2022

supports probable cause that Leonard and Christy Vandenberg did not intend to use the proceeds

of the loans for authorized business purposes at the time of the applications, but rather intended

to use the loan proceeds to personally enrich themselves, in violation of the terms of the loans

agreements.

***JP Stone Account in the name of SDGTEX Restaurants Inc. ending in 0939:***

93.     During the investigation, agents obtained bank account information for a JP Stone

bank account in the name of SDGTEX Restaurants Inc. ending in 0939 (JP 0939).  JP 0939 is a

business account whose signers are Leonard Vandenberg and Christy Vandenberg.  Bank records

list Leonard Vandenberg as "President" and Christy Vandenberg as "Secretary to President."

The account was opened on or about May 20, 2020.

94.     The following chart summarizes COVID relief loan proceeds deposited into JP

0939:

| Business Entity | Date | Amount | Loan Type | SBA Loan Number | Loan Guarantor(s) |
|---|---|---|---|---|---|
| SDGTEX Restaurants Inc. | 5/26/2020 | $50,000.00 | PPP | 346242 | Leonard Vandenberg and Christy Vandenberg |
| | **TOTAL** | **$50,000.00** | | | |

95.     The records show the account received $50,000.00 in PPP loan proceeds for the

above referenced loan, for which Leonard Vandenberg and Christy Vandenberg were guarantors.

96.     FBI personnel conducted a financial analysis for JP 0939 covering the time period

between May 2020 and May 2021.  FBI personnel identified account credits and debits.  The

figures below do not include the above-mentioned PPP/EIDL loan proceed or transfers to

brokerage services.

JP Stone 0939 SDGTEX Restaurants Inc.

| Years | Amount (CR) | Amount (DR) | Sum of Net Activity |
|---|---|---|---|
| 2020 Total | $      75,000.00 | $      (80,750.80) | $      (5,750.80) |
| 2021 Total | | $      (44,265.32) | $      (44,265.32) |
| Grand Total | $      75,000.00 | $      (125,016.12) | $      (50,016.12) |

97.     Outflows from JP 0939 include the following:

| TRANSACTION DESCRIPTION | PAYEE | DATE | AMOUNT |
|---|---|---|---|
| Transfers | Corclyn Enterprises JP 7426 | June 5, 2020 – July 30, 2020 | $80,694.24 |
| Transfers | Leonard and Christy Vandenberg JP 3360 | April 7, 2021 | $5,000.00 |
| Checking Withdrawal Closure | Account holder | May 11, 2021 | $39,237.10 |

98.     As indicated in these charts, this operating account would have operated at a significant loss absent the $50,000.00 PPP loan received in May 2020.  With the $50,000.00 loan, the account essentially broke even as of the end of the period analyzed by the FBI (i.e., the -$50.016.12 would essentially be cancelled out if the $50,000.00 in loan proceeds had been included in the analysis).  It appears that the $50,000.00 in loan proceeds, as well as a $75,000.00 currency deposit comprising the majority of the other contents of the account, were effectively distributed to (1) JP 7426, (2) a personal bank account belonging to Leonard and Christy Vandenberg ending in 3360, and (3) an account-closing withdrawal of all remaining funds.

***JP Stone Account in the name of LCV Real Estate ending in 7412***

99.     During the investigation, agents obtained bank account information for a JP Stone bank account in the name of LCV Real Estate ending in 7412 (JP 7412).  JP 7412 is a business

account which was opened on or about May 23, 2018 and lists Leonard Vandenberg and Christy Vandenberg as "managing members" and J.P. as a "convenience signer."

100.    The following chart summarizes COVID relief loan proceeds deposited into JP 7412:

| Business Entity | Date | Amount | Loan Type | SBA Loan Number |
|---|---|---|---|---|
| LCV Real Estate | 4/16/2020 | $2,000.00 | EIDL | 8464537408 |
| LCV Real Estate | 5/29/2020 | $11,000.00 | EIDL | 8464537408 |
| LCV Real Estate | 4/12/2022 | $13,000.00 | EIDL | 8464537408 |
| LCV Real Estate | 5/10/2022 | $250,900.00 | EIDL | 8464537408 |
| | TOTAL | $276,900.00 | | |

101.    FBI personnel conducted a financial analysis for JP 7412 covering the time period between January 2019 and December 2022.  FBI personnel identified account credits and grouped what appeared to be legitimate business deposits.  FBI personnel identified account debits including vendor payments, payroll, and taxes and grouped them as expenses.  The figures below do not include the above-mentioned PPP/EIDL loan proceed or transfers to brokerage services.

JP 7412 LCV Real Estate

| Years | Amount (CR) | Amount (DR) | Sum of Net Activity |
|---|---|---|---|
| 2019 Total | $ 180,630.37 | $ (183,403.66) | $ (2,773.29) |
| 2020 Total | $ 192,783.25 | $ (196,833.99) | $ (4,050.74) |
| 2021 Total | $ 568,081.89 | $ (230,885.13) | $ 337,196.76 |
| 2022 Total | $ 604,108.79 | $ (561,356.31) | $ 42,752.48 |
| Grand Total | $ 1,545,604.30 | $ (1,172,476.09) | $ 373,125.21 |

102.    In 2019, monthly revenue averaged approximately $15,052.53.  Monthly expenses averaged approximately $15,283.64.  Monthly net balances, or "profits," averaged approximately -$231.11.  Total profits for the year were approximately -$2,773.29.

35

103.    In 2020, monthly revenue averaged approximately $16,065.27.  Monthly expenses averaged approximately $16,402.83.  Monthly profits averaged approximately -$337.56.  Total profits for the year were approximately -$4,050.74.

104.    In 2021, monthly revenue averaged approximately $47,340.16.  Monthly expenses averaged approximately $19,240.43.  Monthly profits averaged approximately $28,099.73.  Total profits for the year were approximately $337,196.76.  These figures reflect the fact that (1) approximately $302,800.00 was transferred from JP 7426 to JP 7412 in October 2021 and (2) approximately $35,000.00 was transferred from JP 3360 to JP 7412 in October 2021.  *See* Exhibit 1B (reference chart for relevant accounts).

105.    In 2022, monthly revenue averaged approximately $50,342.40.  Monthly expenses averaged approximately $46,799.69.  Monthly profits averaged approximately $3,562.71.  Total profits for the year were approximately $42,752.48.  The most significant source of revenue was $400,000.00 that JP Stone records indicate was derived from what appeared to be a home equity loan taken out by Leonard Vandenberg and Christy Vandenberg in March 2022 against a residential property located in Lubbock, TX.

106.    Specific outflows include the following:

| TRANSACTION DESCRIPTION | PAYEE | DATE | AMOUNT |
|---|---|---|---|
| Transfers | TD Ameritrade | 4/21/2022 | $206,543.00 |
| Transfers | TD Ameritrade | 6/17/2022 | $125,000.00 |
| Wire Transfer | Lubbock Abstract Title and Loan Escrow | 10/26/2021 | $297,686.08 |

107.    Records received showed that, prior to the separate $400,000.00 loan described above, Leonard Vandenberg and Christy Vandenberg took out a loan for approximately $488,620.10 on or about December 15, 2021 from JP Stone.  This loan appeared to finance the purchase of the property of ███████████████████.  As of December 2022, open-

source research indicates this address is now a Something Different Grill location.  The proceeds of the $400,000.00 home equity loan, the $489,620.10 commercial real estate loan, and the $276,900.00 in EIDL loans were all comingled in this account.

***City Bank Account in the name of Something Different Grill ending in 0472***

108.    During the investigation, agents obtained bank account information from City Bank (CB 0472) for an account associated with SDGTEX Inc. dba Something Different Grill. The account was opened on or about April 13, 2020.  Leonard Vandenberg and Christy Vandenberg are listed as authorized signers.

109.    The following chart summarized COVID relief loan proceeds deposited into CB 0472:

| Business Entity | Date | Amount | Loan Type | SBA Loan Number | Loan Guarantor(s) |
|---|---|---|---|---|---|
| SDGTEX Restaurants Inc. | 5/19/2020 | $149,900.00 | EIDL | 7701747401 | Leonard Vandenberg and Christy Vandenberg |
| SDGTEX Restaurants Inc. | 4/18/2022 | $349,000.00 | EIDL | 7701747401 | Leonard Vandenberg and Christy Vandenberg |
| | **TOTAL** | **$498,900.00** | | | |

110.    FBI personnel conducted a financial analysis for CB 0472 covering the time period between April 2020 and October 2022.  FBI personnel identified account credits and grouped what appeared to be legitimate business deposits.  FBI personnel identified account debits including vendor payments, payroll, and taxes and grouped them as expenses.  The figures below do not include the above-mentioned PPP/EIDL loan proceed or transfers to brokerage services.

| Years | Amount (CR) | Amount (DR) | Sum of Net Monthly Activity |
|---|---|---|---|
| 2020 Total | $ 1,449,656.87 | $ (1,425,582.14) | $    24,074.73 |
| 2021 Total | $ 2,702,304.76 | $ (2,714,868.35) | $   (12,563.59) |
| 2022 Total | $ 3,314,100.36 | $ (3,642,950.24) | $ (328,849.88) |
| Grand Total | $ 7,466,061.99 | $ (7,783,400.73) | $ (317,338.74) |

This data indicates that, absent the COVID relief loans, the account would have operated at a significant loss during the relevant period.

111.    The following chart summarizes transfers between CB 0472 and the named brokerage accounts (with red text indicating transfers out of CB0472):

| PAYER | PAYEE | DATE(s) | AMOUNT |
|---|---|---|---|
| CB 0472 | TD 5235 | 2/3/2021 | $   (50,000.00) |
| CB 0472 | TD 5235 | 2/11/2021 | $   (50,000.00) |
| CB 0472 | TD 5235 | 8/20/2021 | $   (10,000.00) |
| TD 5235 | CB 0472 | 12/28/2021 | $    50,000.00 |
| CB 0472 | TD 5235 | 1/25/2022 | $   (50,000.00) |
| TD 5235 | CB 0472 | 1/31/2022 | $    50,000.00 |
| CB 0472 | TD 3730 | 4/19/2022 | $ (100,000.00) |
| CB 0472 | TD 3730 | 4/20/2022 | $ (120,000.00) |
| TD 5235 | CB 0472 | 6/16/2022 | $   100,000.00 |
| TD 5235 | CB 0472 | 7/1/2022 | $    50,000.00 |
| TD 3730 | CB 0472 | 7/21/2022 | $   150,000.00 |
| TD 3730 | CB 0472 | 8/18/2022 | $    75,000.00 |
| TD 3730 | CB 0472 | 8/23/2022 | $   100,000.00 |
| TD 3730 | CB 0472 | 9/7/2022 | $    60,000.00 |
| CB 0472 | TD 3730 | 9/16/2022 | $ (200,000.00) |
| CB 0472 | TD 3730 | 9/19/2022 | $ (200,000.00) |
| TD 3730 | CB 0472 | 10/20/2022 | $   104,500.00 |
| Gross Deposits | | | $   739,500.00 |
| Net Deposits | | | $  (40,500.00) |

112.     Based on analysis performed by FBI personnel, the transfers between CB 0472 (one of the operating accounts of SDGTEX) and both TD 5235 (a brokerage account at TD Ameritrade) and TD 3730 (another brokerage account at TD Ameritrade) demonstrate that, although much of the EIDL loan proceeds that went into CB 0472 were ultimately used to cover operating expenses of SDGTEX, on a net basis approximately $40,500.00 in value was extracted from the CB 0472 operating account into TD 5235 and TD 3730, which would not have been possible absent the COVID relief loans. [11]  The transfers between the operating account and the brokerage accounts appear to comingle the COVID relief loan proceeds with the profits of the businesses while extracting some of the value of the proceeds into TD 5235 and TD 3730 for the personal benefit of Leonard and/or Christy Vandenberg.  I submit that, based on this information and the other facts contained in this Affidavit, there is probable cause to believe that these transactions violated 18 U.S.C. § 1956(a)(1)(B)(i), that is, that they "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  I further submit that there is probable cause to believe that each of these transactions over $10,000 violated 18 U.S.C. § 1957 in that each such transaction constituted an instance of Leonard and/or Christy Vandenberg "knowingly

---

[11] This would be contrary to the representation in the LA&A form stating the following:

> Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company.

*See* Exhibit 7 at 5.  SBA records indicate that neither Leonard nor Christy Vandenberg, nor anyone else representing any of the borrowers, requested prior written consent from the SBA to authorize distributions of the borrowers' assets to the brokerage accounts.

engag[ing] in or attempt[ing] to engage in a transaction in criminally derived property of a value greater than $10,000" of property that was "derived from specified unlawful activity."

***City Bank Account in the name of Something Different Grill ending in 0686***

113.    During the investigation, agents obtained bank account information from City Bank for Something Different Grill (CB 0686).

114.    The following chart summarized COVID relief loan proceeds deposited into CB 0686:

| Business Entity | Date | Amount | Loan Type | SBA Loan Number | Loan Guarantor(s) |
|---|---|---|---|---|---|
| SDGTEX Restaurants Inc. | 4/15/2020 | $10,000.00 | EIDL | 7701747401 | Leonard Vandenberg and Christy Vandenberg |
| | **TOTAL** | **$10,000.00** | | | |

115.    FBI personnel conducted a financial analysis for CB 0686 covering the time period between December 2017 and May 2020.  FBI personnel identified account credits and grouped what appeared to be legitimate business deposits.  FBI personnel identified account debits including vendor payments, payroll, and taxes and grouped them as expenses.  The figures below do not include the above-mentioned PPP/EIDL loan proceeds or transfers to brokerage services.

| Years | Amount (CR) | Amount (DR) | Sum of Monthly Activity |
|---|---|---|---|
| **2017 Total** | $     174,900.43 | $    (200,498.79) | $      (25,598.36) |
| **2018 Total** | $  2,015,776.08 | $ (2,045,949.57) | $      (30,173.49) |
| **2019 Total** | $  1,734,460.67 | $ (1,733,202.30) | $        1,258.37 |
| **2020 Total** | $     467,148.46 | $    (492,111.24) | $      (24,962.78) |
| **Grand Total** | **$  4,392,285.64** | **$ (4,471,761.90)** | **$      (79,476.26)** |

116.    FBI analysis did not identify any significant misapplication of the $10,000.00 in EIDL proceeds deposited into this account.  No funds directly identified with this account are included in the proposed property to be seized.  *See* Exhibit 1C (flow of funds).

**JP Stone Account in the name of Leonard Vandenberg and Christy Vandenberg ending in 3360**

117.    A JP Stone personal checking account in the name of Leonard Vandenberg and Christy Vandenberg ending in 3360 (JP 3360) was discovered and analyzed during the investigation.  JP 3360 was opened on or about June 6, 2018.

118.    From April 1, 2020 to October 4, 2022, JP 3360 received approximately $330,978.08 in transfers from JP 7412 and JP 7426.

119.    From April 30, 2020 to October 14, 2022, JP 3360 received approximately $137,561.90 in payroll deposits from Something Different, including from CB 0472 and CB 0686.

120.    This account appears to have been used by Leonard and/or Christy Vandenberg to receive payroll from their own employment with businesses they owned.  Funds directly identified with this account are not included in the proposed property for seizure.  *See* Exhibit 1C (flow of funds).

**Wells Fargo Account in the name of Leonard Vandenberg and Christy Vandenberg ending in 4606**

121.    A Wells Fargo personal checking account in the name of Leonard Vandenberg and Christy Vandenberg ending in 4606 (WF 4606) was discovered and analyzed during the investigation.  WF 4606 was opened on or about April 11, 2007.

122.     No PPP or EIDL loan proceeds appear to have been deposited directly into WF 4606.

123.     From March 3, 2020 to November 10, 2022, payroll deposits were made to Leonard Vandenberg into WF 4606 from "Something Differ Payroll…" totaling approximately $368,969.36.

124.     From March 30, 2020 to February 1, 2021, five transfers between WF 4606 and a Robinhood trading account ending in 3505 were made, resulting in a net transfer of approximately $30,000.00 from WF 4606 to the Robinhood trading account ending in 3505.[12]

***Robinhood Account in the name of Leonard Vandenberg ending in 3505***

125.     Robinhood is an American financial services company that facilitates trades of stocks, exchange-traded funds, and cryptocurrencies.  Over the course of the investigation, a Robinhood account in the name of Leonard Vandenberg ending in 3505 (RH 3505) was discovered and analyzed by FBI personnel.

    a.   The account application was created on or about December 13, 2018 and approved on or about December 14, 2018.

    b.   According to records obtained from Robinhood, RH 3505 had two accounts listed in ACH Relationship details: JP 7426 and WF 4606.

---

[12] This $30,000.00 in net transfers appears to comprise legitimate salary income paid into WF 4606.  The United States is nevertheless requesting that the $30,000.00 be included in the property to be seized because there is probable cause to believe that it is property involved in money laundering.  The $30,000.00 ultimately ended up going into the TD Ameritrade Account ending in 5235 (into which the Robin Hood account ending in 3505 was eventually transferred, as indicated below).  As explained in this Affidavit, there is probable cause to believe that the purpose of TD 5235 was to conceal the proceeds of specified unlawful activity, namely wire fraud, bank fraud, and conspiracy.  The entire contents of the account may therefore be seized as property "involved in" money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

c.  The account statement from June 2019 shows a portfolio value of approximately

$6,120.36.

d.  Account statements from July 2019 to February 2020 show a portfolio value of

$0.00.

e.  From May 2020 to January 2021, approximately 9 ACH deposits were made into

RH 3505 from JP 7426, totaling approximately $330,000.00.  The transactions are

summarized below:

| Payer | Payee | Date | Amount |
|-------|-------|------|--------|
| JP 7426 | RH 3505 | 5/26/2020 | $10,000.00 |
| JP 7426 | RH 3505 | 6/3/2020 | $20,000.00 |
| JP 7426 | RH 3505 | 6/8/2020 | $20,000.00 |
| JP 7426 | RH 3505 | 6/12/2020 | $30,000.00 |
| JP 7426 | RH 3505 | 6/19/2020 | $50,000.00 |
| JP 7426 | RH 3505 | 6/24/2020 | $50,000.00 |
| JP 7426 | RH 3505 | 8/31/2020 | $50,000.00 |
| JP 7426 | RH 3505 | 12/10/2020 | $50,000.00 |
| JP 7426 | RH 3505 | 1/28/2021 | $50,000.00 |
|  |  | **Total:** | **$330,000.00** |

f.  Account statements from WF 4606 and RH 3505 were analyzed to determine

what transactions occurred between the accounts.  Between July 2019 and

February 2021 six transactions occurred, totaling net deposits into RH 3505 of

approximately $23,879.64.  The transactions are summarized below (with red text

indicating transfers out of RH 3505):

| Payer | Payee | Date | Amount |
|-------|-------|------|--------|
| RH 3505 | WF 4606 | 7/8/2019 | ($6,120.36) |
| WF 4606 | RH 3505 | 3/31/2020 | $5,000.00 |
| WF 4606 | RH 3505 | 4/10/2020 | $5,000.00 |
| WF 4606 | RH 3505 | 4/22/2020 | $5,000.00 |
| WF 4606 | RH 3505 | 6/30/2020 | $5,000.00 |

| | | | |
|---|---|---|---|
| WF 4606 | RH 3505 | 2/1//2021 | $10,000.00 |
| | | **Gross Deposits:** | **$30,000.00** |
| | | **Net Deposits** | **$23,879.64** |

g. In February 2021, the portfolio's starting value in February was approximately $412,638.14. That month, the portfolio was transferred in its entirety to a TD Ameritrade account ending in 5235.

***TD Ameritrade Account in the name of Leonard Vandenberg and Christy Vandenberg* (TD 5235)**

126.   TD Ameritrade is a stockbroker that offers an electronic trading platform for the trade of financial assets. A TD Ameritrade account ending in 5235 (TD 5235) was discovered in the name of Leonard Vandenberg and Christy Vandenberg. The application for TD 5235 was submitted on or about February 1, 2008.

127.   According to an account statement from TD 5235 dated 1/1/21-2/28/21, the account's starting balance was $0.00.

128.   Account statements from JP 7426 and TD 5235 were analyzed to determine what transactions occurred between these accounts. The transactions between the accounts are summarized below (with red text indicating transfers out of TD 5235):

| Payer | Payee | Date | Amount |
|---|---|---|---|
| JP 7426 | TD 5235 | 2/2/2021 | $   20,000.00 |
| JP 7426 | TD 5235 | 2/3/2021 | $   50,000.00 |
| JP 7426 | TD 5235 | 2/11/2021 | $   50,000.00 |
| JP 7426 | TD 5235 | 2/23/2021 | $   20,000.00 |
| JP 7426 | TD 5235 | 3/1/2021 | $   50,000.00 |
| JP 7426 | TD 5235 | 6/23/2021 | $ 100,000.00 |
| TD 5235 | JP 7426 | 7/2/2021 | $ (160,000.00) |
| TD 5235 | JP 7426 | 7/22/2021 | $ (190,000.00) |
| JP 7426 | TD 5235 | 8/2/2021 | $   50,000.00 |
| JP 7426 | TD 5235 | 9/3/2021 | $ 100,000.00 |

| | | | | |
|---|---|---|---|---|
| JP 7426 | TD 5235 | 10/18/2021 | $ | 200,000.00 |
| TD 5235 | JP 7426 | 10/26/2021 | $ | (250,000.00) |
| TD 5235 | JP 7426 | 10/27/2021 | $ | (45,000.00) |
| JP 7426 | TD 5235 | 1/31/2022 | $ | 50,000.00 |
| JP 7426 | TD 5235 | 5/13/2022 | $ | 130,000.00 |
| JP 7426 | TD 5235 | 6/10/2022 | $ | 150,000.00 |
| | | | **Gross Deposits** | **$  970,000.00** |
| | | | **Net Deposits** | **$  325,000.00** |

129.    Account statements from CB 0472 and TD 5235 were analyzed to determine what transactions occurred between these accounts. The transactions between the accounts are summarized below (with red text indicating transfers out of TD 5235):

| Payer | Payee | Date | Amount |
|---|---|---|---|
| CB 0472 | TD 5235 | 2/3/2021 | $50,000.00 |
| CB 0472 | TD 5235 | 2/11/2021 | $50,000.00 |
| CB 0472 | TD 5235 | 8/20/2021 | $10,000.00 |
| TD 5235 | CB 0472 | 12/28/2021 | ($50,000.00) |
| CB 0472 | TD 5235 | 1/25/2022 | $50,000.00 |
| TD 5235 | CB 0472 | 1/31/2022 | ($50,000.00) |
| TD 5235 | CB 0472 | 6/16/2022 | ($100,000.00) |
| TD 5235 | CB 0472 | 7/1/2022 | ($50,000.00) |
| | | **Gross Deposits:** | **$160,000.00** |
| | | **Net Deposits:** | **($90,000.00)** |

130.    Based on analysis performed by FBI personnel, the transfers between TD 5235 and both JP 7426 (the operating account of Corclyn Enterprises) and CB 0472 (one of the operating accounts of SDGTEX) did not appear to serve any legitimate business purpose.[13] Rather, transfers between the operating accounts and the brokerage account appear to comingle the COVID relief loan proceeds with the profits of the businesses while extracting the value of

---

[13] The transactions did not, for example, provide operating capital when the operating account balances were low; nor were they necessary to cover capital expenditures or payroll expenses.

the proceeds into TD 5235 for the personal benefit of Leonard and/or Christy Vandenberg.[14]  I submit that, based on this information and the other facts contained in this Affidavit, there is probable cause to believe that these transactions violated 18 U.S.C. § 1956(a)(1)(B)(i), that is, that they were "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  I further submit that there is probable cause to believe that each of these transactions violated 18 U.S.C. § 1957 in that each of the transactions constituted an instance of Leonard and/or Christy Vandenberg "knowingly engag[ing] in or attempt[ing] to engage in a transaction in criminally derived property of a value greater than $10,000" of property that was "derived from specified unlawful activity."

131.    A TD Ameritrade account statement showed the total value of TD 5235 to be approximately $392,840.35 as of December 31, 2022.  Based on the facts set out in this Affidavit, I submit that the entirety of these funds constitute proceeds of wire fraud, bank fraud, and conspiracy, and/or property involved in money laundering or property traceable to money laundering.

---

[14] This would be contrary to the representation in the LA&A form stating the following:

> Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company.

*See* Exhibit 7 at 5.  SBA records indicate that neither Leonard nor Christy Vandenberg, nor anyone else representing any of the borrowers, requested prior written consent from the SBA to authorize distributions of the borrowers' assets to the brokerage accounts.

***TD Ameritrade Account in the name of Leonard Vandenberg and Christy Vandenberg 8240***

132.     A TD Ameritrade account ending in 8240 (TD 8240) was discovered in the name of Leonard Vandenberg and Christy Vandenberg and was analyzed by FBI personnel.  The application for TD 8240 appeared to be signed via Docusign by Leonard C. Vandenberg and Christy J. Vandenberg on or about May 4, 2022.  The investment advisor was listed as Fisher Investments.

133.     Numerous financial instruments totaling approximately $482,671.39 in value were transferred into TD 8240 from TD 5235 on May 11, 2022.  Also on May 11, 2022, approximately $234,697.95 in cash or similar financial instruments was transferred into TD 8240 from TD 5235.

134.     As of September 2022, the above-mentioned transfers were the only transfers made into TD 8240.

135.     A TD Ameritrade account statement showed the total value of TD 8240 to be approximately $712,871.37 as of December 31, 2022.  Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that the entirety of these funds constitute proceeds of wire fraud, bank fraud, and conspiracy, and/or property involved in money laundering or property traceable to money laundering.

***TD Ameritrade Account in the name of Leonard Vandenberg 3730***

136.     A TD Ameritrade account ending in 3730 (TD 3730) was discovered in the name of Leonard Vandenberg and was analyzed by FBI personnel.  The application for TD 3730 was submitted on or about April 7, 2022.

137.     Account statements from April 2022 show that approximately two transfers from TD 5235 were made to TD 3730, totaling $50,000.00.

138.     Account statements from JP 7426, JP 7412, CB 0472, and TD 3730 were analyzed to determine what transactions occurred between these accounts.  The transactions between these accounts are summarized below (with red text indicating transfers out of TD 3730):

| Payer | Payee | Date | Amount |
|---|---|---|---|
| CB 0472 | TD 3730 | 4/19/2022 | $100,000.00 |
| CB 0472 | TD 3730 | 4/20/2022 | $120,000.00 |
| JP 7412 | TD 3730 | 4/21/2022 | $206,543.00 |
| JP 7426 | TD 3730 | 4/25/2022 | $250,000.00 |
| JP 7426 | TD 3730 | 4/26/2022 | $250,000.00 |
| JP 7426 | TD 3730 | 4/27/2022 | $250,000.00 |
| JP 7426 | TD 3730 | 5/3/2022 | $250,000.00 |
| JP 7426 | TD 3730 | 5/31/2022 | $250,000.00 |
| JP 7412 | TD 3730 | 6/17/2022 | $125,000.00 |
| JP 7426 | TD 3730 | 6/21/2022 | $200,000.00 |
| TD 3730 | JP 7426 | 7/12/2022 | ($100,000.00) |
| TD 3730 | CB 0472 | 7/21/2022 | ($150,000.00) |
| TD 3730 | CB 0472 | 8/18/2022 | ($75,000.00) |
| TD 3730 | CB 0472 | 8/23/2022 | ($100,000.00) |
| JP 7426 | TD 3730 | 9/7/2022 | $250,000.00 |
| TD 3730 | CB 0472 | 9/7/2022 | ($60,000.00) |
| JP 7426 | TD 3730 | 9/15/2022 | $250,000.00 |
| CB 0472 | TD 3730 | 9/16/2022 | $200,000.00 |
| CB 0472 | TD 3730 | 9/19/2022 | $200,000.00 |
| TD 3730 | CB 0472 | 10/20/2022 | ($104,500.00) |
| TD 3730 | JP 7426 | 11/10/2022 | ($50,000.00) |
| TD 3730 | JP 7426 | 12/2/2022 | ($100,000.00) |
| TD 3730 | JP 7426 | 12/30/2022 | ($50,000.00) |
| | | **Gross Deposits:** | **$2,901,543.00** |
| | | **Net Deposits:** | **$2,112,043.00** |

139.     Based on the funds which would have normally been received from the operations of Something Different Restaurants associated with the account (i.e., setting aside the PPP and EIDL proceeds), JP 7426 would have only been able to fund the transfer of $250,000.00 made to

TD Ameritrade on April 25, 2022.  The remaining $1,480,000.00 in transfers would have resulted in a negative bank account balance beginning April 26, 2022.

140.    Based on analysis performed by FBI personnel, the transfers between TD 3730 and both JP 7426 and CB 0472 did not appear to serve any legitimate business purpose.[15] Rather, transfers between the operating accounts and the brokerage account appear to comingle the COVID relief loan proceeds with the profits of the businesses while extracting the value of the proceeds into TD 3730 for the personal benefit of Leonard and/or Christy Vandenberg.[16]  I submit that, based on this information and the other facts contained in this Affidavit, there is probable cause to believe that these transactions violated 18 U.S.C. § 1956(a)(1)(B)(i), that is, that they "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  I further submit that there is probable cause to believe that each of these transactions violated 18 U.S.C. § 1957 in that each of the transactions constituted an instance of Leonard and/or Christy Vandenberg "knowingly engag[ing] in or attempt[ing] to engage in a transaction in criminally derived

---

[15] The transactions did not, for example, provide operating capital when the operating account balances were low; nor were they necessary to cover capital expenditures or payroll expenses.

[16] This would be contrary to the representation in the LA&A form stating the following:

> Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company.

*See* Exhibit 7 at 5.  SBA records indicate that neither Leonard nor Christy Vandenberg, nor anyone else representing any of the borrowers, requested prior written consent from the SBA to authorize distributions of the borrowers' assets to the brokerage accounts.

property of a value greater than $10,000" of property that was "derived from specified unlawful activity."

141.    A TD Ameritrade account statement showed the total value of TD 3730 to be approximately $1,758,429.00 as of December 31, 2022.  Based on the facts set out in this Affidavit, I submit that the entirety of these funds constitute proceeds of wire fraud, bank fraud, and conspiracy as well as property involved in money laundering or property traceable to money laundering.

**TD Ameritrade Account in the name of B.V. 8585**

142.    A TD Ameritrade account ending in 8585 (TD 8585) was discovered in the name of B.V. and was analyzed by FBI personnel.  The application for TD 8585 was submitted on or about November 14, 2022.  The application lists Leonard Vandenberg as the parent and custodian.

143.    Account statements from November 2022 show that one transfer from TD 3730 was made to TD 8585, totaling $6,000.00.  Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that the entirety of these funds constitute proceeds of wire fraud, bank fraud, and conspiracy as well as property involved in money laundering or property traceable to money laundering.

**TD Ameritrade Account in the name of D.V. 1306**

144.    A TD Ameritrade account ending in 1306 (TD 1306) was discovered in the name of D.V. and was analyzed by FBI personnel.  The application for TD 1306 was submitted on or about November 14, 2022.  The application lists Leonard Vandenberg as the parent and custodian.

145.     Account statements from November-December 2022 show that one transfer from TD 3730 was made to TD 1306, totaling $6,000.00.  Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that that the entirety of these funds constitute proceeds of wire fraud, bank fraud, and conspiracy as well as property involved in money laundering or property traceable to money laundering.

**TD Ameritrade Account in the name of B.V. 7971**

146.     A TD Ameritrade account ending in 7971 (TD 7971) was discovered in the name of B.V. and was analyzed by FBI personnel.  The application for TD 7971 was submitted on or about November 14, 2022.  The application lists Leonard Vandenberg as the parent and custodian.

147.     Account statements from November-December 2022 show that one transfer from TD 3730 was made to TD 7971, totaling $6,000.00.  Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that that the entirety of these funds constitute proceeds of wire fraud, bank fraud, and conspiracy as well as property involved in money laundering or property traceable to money laundering.

**TD Ameritrade Account in the name of J.V. 8295**

148.     A TD Ameritrade account ending in 8295 (TD 8295) was discovered in the name of J.V. and was analyzed by FBI personnel.  The application for TD 8295 was submitted on or about November 14, 2022.  The application lists Leonard Vandenberg as the parent and custodian.

149.     Account statements from November-December 2022 show that one transfer from TD 3730 was made to TD 8295, totaling $6,000.00.  Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that that the entirety of these funds constitute

proceeds of wire fraud, bank fraud, and conspiracy as well as property involved in money laundering or property traceable to money laundering.

***Piper PA-24-250 Aircraft***

150.     Records reviewed by FBI personnel indicate that Leonard Vandenberg and Christy Vandenberg own a Piper PA-24-250 Aircraft, serial number 24-3660, tail number N8404P.  Records reviewed by FBI also indicate that Leonard Vandenberg has an active pilot's license.

   a.   Records from USAlliance show that payments of $4,350.00, on July 2, 2019, and $83,000.00, on July 15, 2019, were made from JP 7426 (the Corclyn Enterprises business checking account) to AEROtitle to purchase the Piper PA-24-250 Aircraft.  The records indicate that on July 15, 2019, AEROtitle disbursed $87,000 "to the seller's direction" and $350.00 to AEROtitle as a "buyer's escrow fee."

   b.   Records from USAlliance indicate that on or about July 5, 2019, Leonard Vandenberg applied for a loan to help finance the purchase of a 1964 Piper PA-24-250 aircraft, serial number 24-3660, tail number N8404P.

   c.   The aircraft's estimated value at the time of the loan application was listed as $87,000.00.  Christy Vandenberg was listed as a co-borrower on the loan application.

   d.   The loan was funded to WF 4606 on or about July 26, 2019 for $73,000.00 (i.e., after the sale had actually occurred).

e.  Loan application documents indicate that the aircraft would be flown by Leonard Vandenberg and hangered at KPRZ.  KPRZ is the airport call sign for Portales Municipal Airport, located in Portales, NM.

f.  Records obtained from JP Stone show monthly payments of $120.00 made via check from JP 7426 to Portales Municipal Airport.

g.  According to Portales Municipal Airport's website, hangars may be rented for $120.00 per month.

h.  From September 2019 to May 2022, monthly payments totaling approximately $19,452.18 were made from WF 4606 to pay down the USAlliance loan.[17]

i.  On or about May 17, 2022, JP 7426 received approximately $800,000.00 from SBA in EIDL proceeds.  On or about the same day these funds were received in JP 7426, a transfer in the amount of $63,980.33 was sent to USAlliance Financial from JP 7426.  According to documents obtained from USAlliance, the transferred $63,980.33 went to pay off the above-mentioned aircraft loan.

151.  Based on the facts set out in this Affidavit, I submit that the 1964 Piper PA-24-250 aircraft, serial number 24-3660, tail number N8404P constitutes proceeds of wire fraud, bank fraud, and conspiracy, as well as property involved in money laundering or property traceable to money laundering.  Specifically, the $63,980.33 transaction to pay off the outstanding aircraft loan was funded substantially with EIDL proceeds derived from materially false statements and pretenses included in the loan application materials.  The EIDL application materials were submitted using interstate wires.  There is therefore probable cause to believe that

---

[17] Thus, it appears that loan proceeds from the USAlliance loan, which were disbursed into WF 4606, were then used to make payments on the same USAlliance loan.

the $63,980.33 transaction used to pay off the loan included proceeds of wire fraud in excess of $10,000 and therefore violated 18 U.S.C. § 1957(a).

## **CONCLUSION**

152.    Based on the facts set out in this Affidavit, I submit that there is probable cause to believe that the property listed in paragraph 5 comprises proceeds of wire fraud, bank fraud, and conspiracy in violation of 18 U.S.C. §§ 1343, 1344, and 1349.  I further submit that the property set out in paragraph 5 comprises property involved in money laundering and/or property traceable to money laundering.in violation of 18 U.S.C. § 1956 and 1957.  Based on the forfeiture statutes outlined in this Affidavit, I submit that the property identified in paragraph 5 is subject to civil and criminal forfeiture and may therefore be seized by the United States pursuant to a Seizure Warrant.

153.    Based on my training and experience, I believe that efforts to restrain or enjoin the property pursuant to 21 U.S.C. § 853(e), as incorporated by 18 U.S.C. § 982(b)(1), would be insufficient to maintain the property for forfeiture.  The assets held in the brokerage accounts identified in this Affidavit are highly liquid and would therefore be easy to dissipate and difficult to trace.  The 1964 Piper PA-24-250 aircraft, serial number 24-3660, tail number N8404P is a functioning airplane and can be moved long distances with little notice, including beyond the jurisdiction of the United States.   Furthermore, the property constitutes evidence of the criminal offenses described in this Affidavit and therefore should be maintained in the custody of the United States to facilitate its evidentiary use, as well as its forfeiture.

154.    I therefore request the Court issue the requested Seizure Warrant as authorized under Rule 41 of the Federal Rules of Criminal Procedure and the forfeiture provisions identified in this Affidavit.

## REQUEST FOR SEALING

155.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application.  I believe that sealing these documents is necessary because the information included therein is relevant to an ongoing investigation into criminal activity that is not yet complete.  Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

156.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

157.    This Affidavit was reviewed and approved by AUSA Taylor Hartstein on March 18, 2023.

Respectfully submitted,

Robert T. Balint
Special Agent
Federal Bureau of Investigation

Electronically signed and telephonically sworn on March 20, 2023

HONORABLE JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE